NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0364n.06

Nos. 13-2686/14-1022

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| FEDERAL-MOGUL CORPORATION, | ) | |
| | ) | |
| Plaintiff-Appellee/Cross-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | EASTERN DISTRICT OF MICHIGAN |
| INSURANCE COMPANY OF THE STATE | ) | |
| OF PENNSYLVANIA, | ) | |
| | ) | OPINION |
| Defendant-Appellant/Cross-Appellee. | ) | |

_____

Before: KEITH, MERRITT, and BOGGS, Circuit Judges.

BOGGS, Circuit Judge. This case requires us to construe an insurance contract between Plaintiff-Appellee Federal-Mogul and Defendant-Appellant Insurance Company of the State of Pennsylvania (ISOCOP). The parties dispute the extent to which the contract rendered ISOCOP liable for the damage caused by a 2011 flood. The district court granted summary judgment to Federal-Mogul, holding that the contract did not specially limit ISOCOP's liability for this flood. We reverse the judgment of the district court and remand for further proceedings, including consideration of the claim that Federal-Mogul presented on cross-appeal.

**I**

Federal-Mogul operates an automobile parts factory in the Rojana Industrial Park (Rojana Facility). The Rojana Facility is near Thailand's Chao Phraya River, which often floods. During one recent period of thirty years, the area in which the Rojana Facility is located flooded six times: in 1983, 1995, 1996, 2006, 2010, and 2011.

Prior to the 2011 flood, Federal-Mogul purchased from ISOCOP a policy insuring factories against flood damage, among other kinds of loss. The policy consists of several sections: (A) "Declarations," (B) "Property Damage," (C) "Time Element," (D) "Loss Adjustment and Settlement," (E) "General Provisions," (F) "Definitions," and (G) "Appendix."

The "Property Damage" section provides for insurance against damage caused by flood, among other perils. The subprovisions limit ISOCOP's liability for property damage due to flood to $200 million, except for floods in High Hazard Zones for Flood ($30 million limit) and Moderate Hazard Zones for Flood ($70 million limit). The "Time Element" section provides for insurance against loses including gross earnings, extra expenses, leasehold interest, rental insurance, and commissions, profits, and royalties.

The 2011 flood caused over $64 million worth of damage to Federal-Mogul's property. During the course of this litigation, the parties stipulated that, due to the flood, Federal-Mogul lost $64.5 million. The parties further stipulated that $39,406,467 of that damage was physical and $25,093,533 was time-element loss. After Federal-Mogul submitted its claim for payment, ICOSOP paid Federal-Mogul $30 million and indicated that it considered the Rojana Facility to be in a High Hazard Zone. Federal-Mogul disagreed and sued. After expert discovery and reports, Federal-Mogul moved for summary judgment. ISOCOP cross-moved for summary judgment. The district court denied ICOSOP's motion and granted Federal-Mogul's. ICOSOP timely appealed.

Federal-Mogul cross-appealed, contending that "the Policy's flood sublimits are restricted to physical damage caused by flood, whereas Federal-Mogul's loss includes . . . separate time element loss . . . . The Policy has no 'Time Element' sublimit. Therefore, the Policy's $200 million blanket limit applies to the time element loss." Appellee Br. 49.

## II

We consider the district court's grant of summary judgment to Federal-Mogul. "We review an order granting summary judgment de novo . . . ." *Ky. Commercial Mobile Radio Serv. Emergency Telecomms. Bd. v. TracFone Wireless, Inc.*, 712 F.3d 905, 912 (6th Cir. 2013).

### A

The parties dispute whether the Rojana Facility was within a High Hazard Zone for Flood, as defined by the policy. The policy defines "High Hazard Zones for Flood" as:

> a) all property at a 'location' that is partially or totally situated in an area which at the time of the loss or damage has been designated on a Flood Insurance Rate Map (FIRM) to be a Special Flood Hazard Area (SFHA), and/or
> b) all property in areas where the National Flood Insurance Program (NFIP) is not in effect, and where all property at a 'location' is partially or totally situated in an area which is within a *100 year flood plain* or its worldwide equivalent, and/or
> c) all property at a "location" that is partially or totally protected by dams, dikes, levees or walls which were intended to protect such property from the level of a 100 year flood or its worldwide equivalent, regardless of any Zone or Area designation or assignment by the Federal Insurance and Mitigation Administration (FIMA) or other recognized authority having jurisdiction.

(emphasis added).

In the United States, the Federal Insurance and Mitigation Administration (FIMA) administers the National Flood Insurance Program (NFIP). NFIP publishes maps of floodplains, using the pre-existing concept of 100-year floods and 100-year floodplains.[1] Canada, Australia, and member countries of the European Union have similar programs. But most countries do not. If not noted on a regulatory map, can a 100-year floodplain—as mentioned in the policy contract—exist? That question drives this dispute. We hold that it can.

---

[1] The policy speaks of a "flood plain," but dictionaries indicate that the phrase is one word: "floodplain." *See, e.g.*, Webster's Ninth New Collegiate Dictionary 474 (1986). In this opinion, we use one word, except to quote accurately.

We must "interpret contract language in accordance with its plain meaning." *Switzer v. Hayes Wheels Intern., Inc.*, 205 F.3d 1342 (6th Cir. 2000) (table). "Where a contract is not ambiguous, courts are obligated to accept . . . the plain meaning of the words used." *Tel-Towne Props. Grp. v. Toys "R" Us–Del., Inc.*, 123 F. App'x 656, 660 (6th Cir. 2005) (internal citations and quotation marks omitted). Section 2(b) provides that property situated in area that is within a 100-year floodplain and not covered by NFIP is a High Hazard Zone. To determine whether the Rojana Facility is in a High Hazard Zone, we must determine what the policy means by "100 year flood plain or its worldwide equivalent," and whether that meaning is unambiguous.[2]

**B**

The word "floodplain" has an unambiguous meaning. A floodplain is "level land that may be submerged by floodwaters," Webster's Ninth Collegiate Dictionary (1986), i.e., "the normally dry land area adjoining rivers, streams, lakes, bays, or oceans that is inundated during flood events," Ven Te Chow et al., Applied Hydrology 517 (1988). So a floodplain exists independently of a map denoting its existence.

An area was within a 100-year floodplain on a certain date if, on that date, it would experience flooding during a 100-year flood, i.e., there was a 1% chance of it experiencing flooding in any given year. Whether there was a 1% chance of an area experiencing flooding is a question of fact. A fact is any "aspect of reality," Black's Law Dictionary 628 (8th ed. 2004) (Black's), i.e., any thing (and "not just [a] tangible thin[g], actual occurenc[e], [or] relationshi[p]," *ibid.*) that has "the quality of being actual," Webster's Ninth New Collegiate Dictionary 444 (1986). For example, "[a]n actual or alleged event *or circumstance*" can be a fact. Black's at 628. ISOCOP alleges a circumstance: that the Rojana Facility is in an area that

---

[2] The parties dispute who bears the burden of demonstrating whether the Rojana Facility was or was not in a High Hazard Zone. But neither party suggests that the burden affects the outcome. We assume without deciding that ISOCOP bears the burden of proof.

has a 1% chance of flooding each year. The statistical nature of the 100-year floodplain concept does not undermine its use in legal documents or court proceedings, both of which often refer to facts.

"A finding of fact may . . . stem from an assessment of what is expected to occur in the future. . . . The likelihood (an inferential fact) may be established through, for example, testimony of past experience . . . or even expert opinion . . . ." *Kaplun v. Attorney General*, 602 F.3d 260, 269 (3d Cir. 2010). The contract that we interpret here contemplates a lower policy limit for locations subject to a 1% likelihood of flooding each year.

Not only does this reading of the contract accord with the plain meaning of the words at issue, it also means that the third subsection of the relevant contract language has a clear purpose. Section 2(c) indicates that an area may be a High Hazard Zone for Flood if, according to floodplain projections, there is less than a 1% chance of the area experiencing flooding each year, but where people sufficiently fear flooding that they have protected the area as if there were at least a 1% chance of flooding. In addition, § 2(c) clarifies that, for a property within a 100-year floodplain, the existence of protective measures may reduce the damage, but does not reclassify the area from a High Hazard to Moderate Hazard Zone; i.e., building a dike or a dam does not increase ISOCOP's liability for flood damage. The parties decided to limit liability where local knowledge indicates flooding concerns and to clarify that some of the effective cost of protective-measures failure does not fall on the insurer; it was sensible for parties to state both decisions in the insurance contract.

Federal-Mogul explains the language differently. Federal-Mogul argues that, until denoted by an NFIP or similar map designed with the regulatory purpose of informing insurance-collection proceedings, a floodplain is a statistical concept without reality. Appellee Br. 23-25,

45. To support these claims, Federal Mogul offers only "a series of assertions by its experts . . . ." Response and Reply Br. 13. These assertions cannot change the literal meaning of the contract.

Federal-Mogul also objects to a literal construction of the contract on policy grounds. *See, e.g.*, Appellee Br. 20 ("Because any interpretation of the Policy must be workable for all claims, not simply a single claim, the likely consequences of a proposed interpretation are important."); *see also* Decl. and Expert Report of Professor Kenneth S. Abraham at ¶ 7, ("It is strongly in the interest of both policyholders and insurers to establish limits of liability that are determinate . . . before a loss occurs"); *id.* at ¶ 20 (listing other methods of "dealing with losses that are larger than may have been anticipated at the time of risk transfer"); *id.* at ¶ 34 (warning that "difficult-to-determine limits of liability would tend to result in higher premiums, and easily determinable limits of liability would tend to result in lower premiums").

But we cannot rewrite an otherwise valid contract simply because, after the fact, lawyers can think of better ways to structure similar deals. The fact that Federal-Mogul now believes a different policy would be superior to the policy for which it originally contracted, as construed by ICOSOP, also does not demonstrate that the contracted policy, as construed by ICOSOP, is unreasonable. Similarly, whether or not the sort of contract at issue reflects an intelligent or efficient way to insure production against floods is not relevant to our decision. Besides, Federal-Mogul's parade down the slippery slope—untold numbers of insurance contracts rendered useless, every policy's premium rising to account for the uncertainty—only seems horrible until the mechanics of that doomsday scenario are laid bare: if our holding that "floodplains" can be determined either ex ante by a regulator or after a flood increases

uncertainty as much as Federal-Mogul says it will, parties to future insurance-policy contracts simply will specify "floodplains as designated by a regulator."

Because we hold that a 100-year floodplain can exist absent identification on a regulatory map, we reverse the district court's grant of summary judgment to Federal-Mogul. "Of course, to call a likelihood 'fact' is not to say that the likely outcome will necessarily occur, but the likelihood itself remains a factual finding that can be made *ex ante . . . .*" *Kaplun*, 602 F.3d at 269-70. So an area can have, as a matter of fact, a 1% chance of flooding, even if no regulator says so. Applying the literal meaning of the contract to this dispute *does* invite the parties to dispute whether the Rojana Facility is located in a 100-year floodplain. The district court did not adjudicate whether ISOCOP demonstrated that the Facility is within an area that has a 1% chance of flooding each year. We remand to the district court to adjudicate that question, after any proceedings necessary to allow each party to present evidence on the question—for example, by ruling on Federal-Mogul's pending motions to exclude ISOCOP's experts. *See, e.g.*, *Plaintiff's Motion To Exclude Expert Reports and Testimony of Dr. Lee E. Branscome*. We enjoy no advantage over the district court in ruling on those pending motions.

### III

Federal-Mogul suggests that "its separate time element claim of $25,093,533 is subject to the Policy's blanket limit of $200 million, [so] Federal-Mogul is entitled to further payment irrespective of the High Hazard Sublimit." Appellee Br. 52. Perhaps Federal-Mogul's most substantial observation in support of this claim is that "when [the contract] limits a Time Element loss in the context of Flood, the Policy says so explicitly." Reply Br. 6.

Because we have not determined whether the Rojana Facility is in a 100-year floodplain, we do not reach Federal-Mogul's cross-motion. On remand, the district court should consider

whether Federal-Mogul can demonstrate that the High Hazard Zone Sublimit for Flood does not limit time-element losses resulting from flood.