PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 16-4316
_____

FAN WANG,
                              Petitioner
v.

THE ATTORNEY GENERAL OF THE
UNITED STATES OF AMERICA,
                              Respondent

_____

On Petition for Review of an Order of the
Board of Immigration Appeals
(Agency No.:  A088-152-814)
Immigration Judge:   Walter A. Durling

_____

Argued September 14, 2017

BEFORE:  CHAGARES, JORDAN,
and NYGAARD, *Circuit Judges*

(Opinion Filed:  August 1, 2018)

Thomas E. Moseley          [Argued]
One Gateway Center, Suite 2600
Newark, NJ 07102

    *Counsel for Petitioner*


Scott M. Marconda
United States Department of Justice
Office of Immigration Litigation
Room 2316
450 5th Street, N.W.
Washington, DC 20001

Eric W. Marsteller
Keith I. McManus          [Argued]
Chad A. Readler
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC 20044

    *Counsel for Respondent*

_____

OPINION OF THE COURT

_____

NYGAARD, *Circuit Judge.*

I.

Fan Wang, a citizen of the People's Republic of China, obtained lawful permanent resident status in the United States on April 29, 2010, and worked as a trading assistant in a financial services firm. In 2011, without authorization, he purchased oil futures contracts using the firm's trading account and transferred those contracts between firm accounts. In company records, Wang marked these contracts as closed (sold) when they were, in fact, still open.

After the firm discovered the transactions, the Federal Bureau of Investigation arrested Wang. The one-count indictment alleged that, upon discovery of a loss of $2.2 million, the firm sold the contracts. Wang pleaded guilty to violating the Commodity Exchange Act (CEA) by Making a False Report in Connection with a Commodities Transaction in violation of 7 U.S.C. § 6b(a)(1)(B) and § 13(a)(2).[1] The court sentenced Wang to three months in prison, with three years supervised release, and ordered him to pay $2.2 million in restitution.

The Attorney General initiated removal proceedings on March 19, 2015, charging Wang with removability by classifying his conviction as an aggravated felony under the Immigration and Nationality Act (INA) section

---

[1] 7 U.S.C. § 13(a): "It shall be a felony punishable by a fine of not more than $1,000,000 or imprisonment for not more than 10 years, or both, together with the costs of prosecution. . . (2). . . knowingly to violate the provisions of section 6, section 6b. . . ." The focus of the analysis here will upon Section 6b(a)(1)(B) (Commodity Exchange Act § 4b).

237(a)(2)(A)(iii). 8 U.S.C. § 1227(a)(2)(A)(iii).[2] The Immigration Judge ordered Wang removed on June 4, 2015, and the Board of Immigration Appeals affirmed. Wang now petitions us to review the Board's order, challenging its ruling that the District Court convicted him of an aggravated felony. For the reasons that follow we will grant his petition and remand the case to the Board.

II.

A.

Although we have jurisdiction to review final orders of removal under 8 U.S.C. § 1252(a), "no court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed a criminal offense covered in section . . . 1227(a)(2)(A)(iii) [aggravated felony]." 8 U.S.C. § 1252(a)(2)(C). We do, however, have jurisdiction to examine "constitutional claims or questions of law." *Catwell v. Attorney General of the United States*, 623 F.3d 199, 205 (3d Cir. 2010) (quoting Section 1252(a)(2)(D)). Therefore, we have authority to take up the issue, using the de novo standard, of whether Wang's conviction qualifies as an aggravated felony because it is "a purely legal question, and one that governs our own

---

[2] INA § 237(a)(2)(A)(iii) (8 U.S.C. § 1227(a)(2)(A)(iii)) states: "Any alien who is convicted of an aggravated felony at any time after admission is deportable."

4

jurisdiction." *Valansi v. Ashcroft*, 278 F.3d 203, 207 (3d Cir. 2002).[3]

## B.

For purposes of section 101(a)(43)(M)(i) of the INA, an aggravated felony includes crimes "[1] involv[ing] fraud or deceit [2] in which the loss to the victim or victims exceeds $10,000." 8 U.S.C. §1101(a)(43)(M)(i). Wang disputes the Board's ruling on both prongs. His first challenge focuses on the language of the statute of conviction which reads: "It shall be unlawful . . . (B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record." Section 6b(a)(1)(B). He is not properly categorized as an aggravated felon, he contends, because crimes "involv[ing] fraud or deceit" require materiality as an element of proof and Section 6b(a)(1)(B) lacks this element.

The Immigration Judge brushed aside Wang's materiality argument. He reasoned that Wang was properly classified as an aggravated felon because, under Section 101(a)(43)(M)(i) of the INA, "deceit" was understood to include crimes of falsification—like Section 6b(a)(1)(B)—without regard to materiality.

---

[3] We have jurisdiction to determine our jurisdiction, giving us the authority to analyze "whether an alien was convicted of a non-reviewable aggravated felony." *Stubbs v. Attorney General of the United States*, 452 F.3d 251, 253 n. 4 (3d Cir. 2006) (citing *Singh v. Ashcroft*, 383 F.3d 144, 150 (3d Cir. 2004)).

On appeal, the Board affirmed the Immigration Judge's removal order, but it moved the focus of its decision away from interpreting the INA and towards an analysis of the criminal statute. The Board concluded that it was "unnecessary" in this case to decide if the INA required materiality because "all relevant portions [of Section 6b(a)(1)] require materiality." Fan Wang, A088 152 814, 1, 3 (BIA 2016). Wang challenges both the Immigration Judge's interpretation of the INA and the Board's conclusions about Section 6b(a)(1)(B), but our review encompasses only the Board's interpretation of the criminal statute.[4]

Whether Section 6b(a)(1)(B) requires proof of materiality, for purposes of the INA, is a matter of first impression for us.[5] We use a categorical approach to analyze

---

[4] Since the Board rendered its own reasoned decision and did not comment on the Immigration Judge's analysis, we review only the Board's opinion. *Kaplun v. Attorney General of the United States*, 602 F.3d 260, 265 (3d Cir. 2010). We look to the decision of the Immigration Judge only to the extent that the Board adopted or relied upon it. *Zhang v. Gonzales*, 405 F.3d 150, 155 (3d Cir. 2005).

[5] Wang maintained that the Government waived this issue, but we are convinced that it is properly before us. Wang also claimed that, since he was convicted in the District Court of the Southern District of New York, precedent of the Court of Appeals for the Second Circuit controls our interpretation of the criminal statute. However, even if we agreed with this premise, there is a dearth of decisional law that is directly on point.

the statute of conviction, examining only the elements of the offense to establish whether the petitioner committed a crime involving fraud or deceit. *Kawashima v. Holder*, 565 U.S. 478, 483 (2012). We do not look at the facts underlying the crime committed by the petitioner. *Singh v. Attorney General of the United States*, 677 F.3d 503, 508 (3d Cir. 2012).

We look first at the words of the statute (*United States v. Wells*, 519 U.S. 482, 483 (1997); *Neder v. United States*, 527 U.S. 1, 20 (1999)), which are as follows:

> It shall be unlawful—
>
> 2) for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person; . . .
>
> (A) to cheat or defraud or attempt to cheat or defraud the other person;
>
> (B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter

7

or cause to be entered for the other person any false record;

(C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person. . .

(D)(i) to bucket an order if the order is either represented by the person as an order to be executed, or is required to be executed, on or subject to the rules of a designated contract market.

Section 6b(a)(1). Obviously, Section 6b(a)(1)(B) does not contain the word "material," nor does it include the words "fraud" or "deceit," but these last two terms are found in subsections (A) and (C), respectively. "'When the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.'" *Official Committee of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 559 (3d Cir. 2003) (quoting *Hartford Underwriters Ins. Co. v. Union*

8

*Planters Bank, N.A.*, 530 U.S. 1, 6 (2000)). But the Board concluded it was necessary to refer to the common law to understand this subsection. The Government supplements the Board's reasoning by urging us to read Section 6b(a)(1)(B) as inextricably intertwined with the provisions that surround it. We see flaws in both analyses.

Picking up, in part, on the Immigration Judge's reasoning, the Board emphasized the conclusion in *Kawashima* that Section 101(a)(43)(M)(i) of the INA "refers more broadly to offenses that 'involv[e]' fraud or deceit—meaning offenses with elements that necessarily entail fraudulent or deceitful conduct." *Kawashima*, 565 U.S. at 484. Relying then on the common law of deceit, the Board concluded that Section 6b(a)(1)(B) is an aggravated felony because:

> [A]s understood at common law, 'deceit' required that any false statement made be material. Thus, because the common law concepts of fraud and deceit required materiality, the materiality requirement was carried forward when concepts were codified in 7 U.S.C. § 6b(a), prohibiting contracts designed to defraud or mislead.

Fan Wang, A088 152 814, 5 (BIA 2016).

"We . . . presume that Congress incorporates the common-law meaning of the terms it uses if those 'terms . . .

have accumulated settled meaning under . . . the common law' and 'the statute [does not] otherwise dictat[e].'" *Wells*, 519 U.S. at 491 (quoting *Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 322 (1992) (additional citations omitted)). But here, in order to incorporate the common law, the Board subsumes offenses of falsehood into crimes of deceit.[6] Our precedent, however, grounded in Supreme Court decisions, acknowledges that the term "false statement" does not have a settled common law meaning and "does not imply a materiality requirement." *United States v. Saybolt*, 577 F.3d 195, 199 (3d Cir. 2009); *Neder*, 527 U.S. at 23 n.7; *Wells*, 519 U.S. at 495. Because of this, we ruled (in a circumstance in which the statute separated the terms "fraud" and "false statement" with a disjunctive) that it was not possible to conclude that violations of that statute always required proof of materiality. *Id.*

The Government responds by pointing to the surrounding provisions of the CEA, encouraging us to understand Section 6b(a)(1)(B) as part of a package of

---

[6] In its examination of Section 101(a)(43)(M)(i) of the INA, the Supreme Court noted in dicta that, at the time this section was enacted, "the term 'deceit' meant a [sic] 'the act or process of deceiving (as by falsification, concealment, or cheating).'" *Kawashima,* 565 U.S. at 484 (quoting Webster's Third New International Dictionary 584 (1993)). However, it did not reconcile this statement with *Neder* (527 U.S. at 23 n.7) and *Wells* (519 U.S. at 495). Moreover, this analysis is focused on the criminal statute, not the INA.

10

intertwined provisions that must be read together.[7] The Government also contends that the CEA provides an inherent point of reference for each subsection, which imputes materiality by prohibiting any fraud, false statements, or deceit that relates to a futures contract. It points to a number of decisions from other Courts of Appeals that—they say—have interpreted the statute this way.

The Court of Appeals for the First Circuit said that "[l]iability attaches under 7 U.S.C. § 6b(a) when there is '(1) the making of a misrepresentation, misleading statement, or a deceptive omission; (2) scienter; and (3) materiality.'" *United States Commodity Futures Trading Comm'n v. JBW Capital*, 812 F.3d 98, 106 (1st Cir. 2016) (quoting *United States Commodity Futures Trading Comm'n v. Hunter Wise Commodities, LLC*, 749 F.3d 967, 981 (11th Cir. 2014) [additional citation omitted]). Similarly, the Court of Appeals

---

[7] The Government asserted that since Section 6b(a)(1)(B) is part of the CEA, not the criminal code, *Wells* and its progeny (that prioritize examination of the statutory text) do not apply. The Government suggests that, in its place, we give greater weight to the broader statutory context of the provision and its legislative history. As we noted above, we have consistently applied the principle that "*where the disposition required by the text is not absurd*" the statute should be enforced "according to its terms.'" *Official Committee of Unsecured Creditors of Cybergenics Corp.*, 330 F.3d at 559 (emphasis added). We are by no means suggesting that statutory context and legislative history are irrelevant to the analysis, but—as we explain *infra*—we see no reason, in this case, to diverge from the framework established in *Wells* that gives the greatest weight to the plain meaning of the words that Congress chose to write into law.

for the Tenth Circuit upheld a civil jury verdict of liability under Section 6b(a)(1), where the record established that, "'in connection with' an order of the sale of a futures contract, [the defendant] misrepresented material facts and executed unauthorized trades and that [a third party] relied upon [defendant's] misrepresentations." *Federal Deposit Insurance Corporation v. UMIC, Inc.*, 136 F.3d 1375, 1384 (10th Cir. 1998).[8]  Finally, the Court of Appeals for the Fifth Circuit said:  "The elements of a *fraud* action under § 4b are derived from the common law action for fraud." *Puckett v. Rufenacht, Bromagen & Hertz, Inc.*, 903 F.2d 1014, 1018 (5th Cir. 1990) (emphasis added).

These opinions do support the notion that materiality is an element of proof in some cases brought under Section 6b(a).[9]  But they do not ground a conclusion that this is true in all cases brought under this section.  Wang's indictment— which the Government characterizes as rare—is, nonetheless,

---

[8] In support of this point, the Government also cited *United States v. Arrington*, 998 F. Supp.2d 847, 865-66 (D. Neb. 2014); *aff'd sub nom. United States Commodity Futures Trading Comm'n v. Kratville*, 796 F.3d 873 (8th Cir. 2015). We note a similar ruling by the Court of Appeals for the Second Circuit. *Saxe v. E.F. Hutton & Co.*, 789 F.2d 105, 111 (2d Cir. 1986).

[9] As noted by the Court of Appeals for the Eleventh Circuit, "[t]he subsections are not entirely separate; a single action may violate more than one." *United States Commodity Futures Trading Comm'n v. Savage*, 611 F.2d 270, 283 (11th Cir. 1979).

evidence that each subsection can be charged separately. Therefore, the analysis in cases like *UMIC* and *JBW* might be persuasive in a case in which the crime involved false reports in combination with either fraud (Section 6b(a)(1)(A)), deceit (Section 6b(a)(1)(C)), or both. But, none of these cases arise solely from a violation of Section 6b(a)(1)(B). This undermines their persuasiveness here.[10]

---

[10] Our review of legislative history did not produce any explicit support for the Government's position. The Grain Futures Act of 1922, Section 5(c) (the forerunner to the provision in question in the Commodity Exchange Act) prevented only the "dissemination . . . of false or misleading or knowingly inaccurate reports." Grain Futures Act, ch. 369 42 Stat. 998 (1922), codified at 7 U.S.C. § 1. The only hint to the scope of this provision is discerned from the objections of some legislators to the inclusion of the term "inaccurate" (originally not qualified as "knowingly inaccurate") because it would criminalize inadvertent mistakes. House Consideration, Amendment and Passage of H.R. 11843, 62 Cong. Rec. 9447 (June 26, 1922). Debate on the Commodity Exchange Act of 1936 generally made it clear that Congress intended to expand the scope of measures in the Grain Futures Act that sought to protect the integrity of transactions in the futures market. Hearings Before the Senate Committee on Agriculture and Forestry, United States Senate on H.R. 6772, 74th Cong. 2d Sess., (April 21-23, 1936) pp. 21-27. However, there is nothing in these materials to support the Government's contention that the false report provision—that essentially replaced Section 5(c)—was imbued with the common law meaning of fraud or deceit. The language and the structure of this set of provisions has remained largely

Moreover, Wang draws our attention to a case in which the Government argued against a materiality requirement in Section 6b(a)(1)(B). *United States v. Ashman*, 979 F.2d 469 (7th Cir. 1992), *cert. denied*, 510 U.S. 814 (1993). In *Ashman*, the defendant asserted on appeal that the District Court erred by leaving out a jury instruction on materiality, which he contended was an element of Section 6b(a)(1)(B). [11] The Court of Appeals upheld the conviction, agreeing with the Government that it should affirm the District Court's ruling that materiality is not an element of this crime. *Id.* at 488.[12] The Government now distances itself

---

unchanged since first codified. *See* Commodity Exchange Act, ch. 545, 49 stat. 1491 (1936), codified at 7 U.S.C. § 1.

[11] The Court of Appeals focused on the following excerpt of the District Court's opinion. "When you're talking about Section (B), to me, ... I don't know what is plainer than to say it is unlawful ... to, quote, 'willfully make or cause to be made a false report.' What that means to me is a simple thing. If you're making a report and you know that it is false, you are willfully making a false report, and it doesn't make any difference whether you are intending to cheat or defraud anybody or not." *Ashman*, 979 F.2d 487–88.

[12] The Board distinguished *Ashman* by noting that the issue considered there was whether the District Court properly instructed the jury. We review jury instructions to "determine whether, '*taken as a whole*, they properly apprized the jury of the issues and the applicable law.'" *United States v. Yeaman*, 194 F.3d 442, 452 (3d Cir. 1999)(quoting *Dressler v. Busch Entertainment Corp.*, 143 F.3d 778, 780 (3d Cir. 1998))(emphasis added). Therefore, we understand the Board

14

from this position, characterizing it as the product of insufficient legal analysis. [13] But at the very least, this case—

to be saying that *Ashman* is not persuasive as to the materiality issue because the ruling concerned the whole jury instruction, not just the elements of the crime. But, the court in *Ashman* explicitly focused on the elements of Section 6b(a)(1)(B) and so we do not share the Board's concerns. The Board also attributed great significance to a reference made in *Ashman* to another case from the Court of Appeals for the Seventh Circuit, (*United States v. Jackson*, 836 F.2d 324, 329 (7th Cir. 1987)), regarding it as evidence that *Ashman* actually ruled that materiality *is* an element of 6b(a)(1)(B). However, *Jackson* arose in the context of a violation of 8 U.S.C. § 152 (giving false oaths in a bankruptcy proceeding) and is, therefore, distinguishable. As a result, this mere reference to *Jackson* in *Ashman*—which, on its face, seems to have been inserted merely to support its handling of the District Court's holding—is wholly unpersuasive as a basis to interpret the holding in *Ashman*.

[13] This argument is unpersuasive in light of our own review (*see supra* n. 10), and is further weakened by a recent Supreme Court decision in which the Government argued against the linkage between false statements and materiality. *Maslenjak v. United States*, 137 S.Ct. 1918, 1920–21 (2017). There, the District Court convicted the defendant with knowingly "procur[ing], contrary to law, [her] naturalization" (18 U.S.C. § 1425(a)) because she violated the law by "knowingly mak[ing] any false statement under oath." 18 U.S.C. § 1015(a). *Id.* The Government argued that the district court properly instructed a jury that materiality was not required to convict for making false statements in the

which focused directly on Section 6b(a)(1)(B)—undermines the Government's efforts to persuade us that materiality has always been a presumptive element in false statement crimes under the CEA.

Moreover, under the rules of statutory construction, the presence of the term "defraud" in Section 6b(a)(1)(A) and "deceive" in Section 6b(a)(1)(C) suggests that Congress' omission of these terms (or any such terms with an accepted common law meaning) in Section (B) was purposeful. *See Rea v. Federated Investors*, 627 F.3d 937, 939 (3d Cir. 2010). Finally, we note that Congress used the word "material" in Section 6b(e)(2), setting forth crimes in the context of contracts of sale on group or index of securities. Again, at the very least, it reminds us that Congress knew when and how to use this term when it was drafting the CEA.

All of this persuades us to give a natural reading to the words "false report or statement" in Section 6b(a)(1)(B), without importing the common law of deceit or fraud into our analysis, and without relying on the cases cited by the Government. The words of the statute do not give us any basis to conclude that materiality is a required element of the offense. Accordingly, for all of these reasons, we will hold

course of applying for citizenship because no mention of materiality is made in the statutes. *Id.* The Court commented that a linkage of the false statement violation to the actual procurement of citizenship was necessary to avoid the absurd result where "some legal violations that do not justify *denying* citizenship under that definition would nonetheless justify *revoking* it later." *Id.* at 1926-27.

that the Board erred by concluding Section 6b(a)(1)(B) requires evidence of materiality.[14]

B.

Wang next maintains that the crime for which he was convicted does not meet the second requirement for an aggravated felony under the INA because it did not result in any loss. INA § 101(a)(43)(M)(i) ("an offense . . . in which the loss to the victim or victims exceeds $10,000"). In contrast to our categorical analysis of the first requirement, we take a circumstance-specific approach here. *Nijhawan v. Holder*, 557 U.S. 29, 38-39 (2009). The Supreme Court characterized the review as examining "the specific way in which an offender committed the crime on a specific occasion." *Id.* at 34. Our review includes not only those documents that may be considered in a modified categorical approach (the indictment, plea agreement, and judgment), but may also include the presentence investigation report (*Kaplun v. Attorney General of the United States,* 602 F.3d 260, 266 (3d Cir. 2010)) and any "sentencing-related material" (*Nijhawan*, 557 U.S. at 42) to enable us "to determine if the government has proved by 'clear and convincing' evidence that his offense involved an actual loss to a victim . . . that exceeds $10,000." *Singh*, 677 F.3d at 512. Consideration of

---

[14] Our opinion today establishes that Wang's statute of conviction under the CEA, 7 U.S.C. § 6b(a)(1)(B), does not require proof of "materiality." To be clear, any opinion the BIA may issue addressing whether materiality is imbedded in the term "fraud" or "deceit" in the INA does not and should not be viewed as extending to the CEA or the securities laws, generally.

these materials is appropriate so long as the petitioner has been given "a fair opportunity" to challenge the Government's claim. *Nijhawan*, 557 U.S. at 41.

The Government produced a record that included the following evidence. A one-count superseding information alleged that after "Company 1" (Wang's employer) discovered Wang had falsely recorded open futures contracts as closed, it liquidated them at a loss of $2.2 million. Next, the District Court judge raised this allegation to Wang at the July 16, 2014, plea colloquy.

> Court: Do you have any understanding as to the loss that was realized as a consequence of your false entries?
>
> Defendant: I don't know.
>
> Court: Do you understand that the government contends that the loss was more than $1 million and less than $2.5 million?
>
> Defendant: Yes.

Hearing Transcript, 7/16/14, at 20, United States v. Fan Wang (14 Cr. 114) (S.D.N.Y. 2014), ECF No. 21. The presentence investigation report detailed the following:

18

Based on the FBI's discussions with the Managing Partner, the FBI learned that on the morning of November 18, 2011, the Managing Partner learned that Company-1 had received a margin call from the Brokerage Firm for $1.2 million dollars related to Account-1. . . . . The clerk's review of Company 1's records uncovered false entries that Wang had made on Company-1's computerized records. These entries concealed the unauthorized purchase on November 16, 2011, of 587 light crude oil futures contracts on Account-1. Specifically, Wang made manual entries in Company-1's records that purported to show that the 587 positions were closed (i.e. sold), when in fact they were still open. Reports reflecting these manual entries were transmitted in interstate commerce to Company-1's accounting department located in Chicago, Illinois. . . . . Based on the FBI's review of Company 1's trading records, the FBI learned that Company-1 ultimately sold the 587 futures contracts

19

> purchased by Wang for a loss of
> $2.2 million.

Presentence Investigation Report, Rev. 9/9/14, at 7, United States v. Fan Wang (S.D.N.Y. 2014) (No. 14 Cr. 411). Finally, the November 19, 2014 judgment specified a "total loss" of $2.2 million. Judgement, 11/17/14, at 5, United States v. Fan Wang (S.D.N.Y. 2014) (No. 14 Cr. 411). The District Court ordered Wang to pay restitution in this amount.

Wang is convinced that the Government never proved that his crime (making false reports) caused the $2.2 million loss. He makes a number of arguments to support this conclusion.

He first maintains that the Immigration Judge and the Board improperly treated the allegation on loss in the indictment as part of his admission of guilt at the time of his plea. He says that he never admitted this,[15] and declares that

---

[15] Wang characterizes the allegation of loss as "surplusage" because it was not necessary to prove the crime. Relying on *Valansi*, he contends that, since this allegation was not necessary to the proof of his crime, his guilty plea alone is not enough to demonstrate that he admitted to every allegation in the indictment. *Valansi*, 278 F.3d at 215-16. We note that we conducted a modified categorical review in *Valansi*, not a circumstance-specific review. But we appreciate Wang's argument that the legitimacy of this general principle is not impacted by this contextual distinction.

he actually disputed it.[16]  Regardless of whether he admitted it, we disagree that the Board based its decision on a conclusion that Wang admitted to the loss.  There is nothing in the record to support this, and the Board specifically affirmed the Immigration Judge's reliance on the District Court's judgment specifying a total loss amount.

Next, Wang stresses that the "loss must be tied to the specific counts covered by the conviction."  *Nijhawan*, 557 U.S. at 42 (internal quotation marks omitted).[17] He then attacks the Board's use of the District Court's reference to a total loss of $2.2 million in its judgment.  Wang says the loss was "surplusage" evidence (not necessary to prove the elements of his crime) and was, therefore, out of bounds.

He supports his characterization of the evidence on loss by pointing to the fact that the District Court considered it during sentencing while it was reviewing "relevant

---

[16] As for Wang's assertion that he actually disputed the loss we note a subtle but significant distinction.  He argued during the sentencing hearing that the loss was not an actual loss because it was incurred by the company's liquidation of the unauthorized contracts.  However, it is notable that he never challenged the truthfulness of the Government's allegation that "Company 1" sold the futures contracts at a $2.2 million loss after discovering his false reporting.

[17] The Court also favorably cited *Alaka* that said the loss must be "tethered" to the offense.  *Nijhawan,* 557 U.S. at 42 (citing *Alaka v. Attorney General of the United States*, 456 F.3d 88, 107 (3d Cir. 2006)).

conduct" under United States Sentencing Guideline Manual §1B1.3. *See United States v. Pollard*, 986 F.3d 44 (3d Cir. 1993) ("Relevant conduct" includes uncharged conduct, beyond the offense of conviction.). He is convinced that a "surplus" allegation in an indictment, presented only as evidence of "relevant conduct" at sentencing, is plainly not tied to his convicted offense. Therefore, according to Wang's understanding of *Nijhawan*, it cannot be used as proof of loss for purpose of Section 101(a)(43)(M)(i) of the INA. Although he is right that evidence of loss was not needed for his conviction, we disagree with the conclusions he draws from this.

First, the Supreme Court made clear that when the Board considers loss under Section 101(a)(43)(M)(i) of the INA, it may go beyond evidence that is necessary to prove the elements of the crime and look at "the specific way in which an offender committed the crime on a specific occasion." *Nijhawan*, 557 U.S. at 34. It reasoned that, if the INA was interpreted as limiting the review of loss only to the evidence required for conviction in fraud crimes, it would effectively require "obtaining from a jury a special verdict on a fact that . . . is not an element of the offense." *Id.* at 42. In practical terms, exclusion of sentencing-related materials would render Section 101(a)(43)(M)(i) virtually inapplicable to fraud crimes committed in jurisdictions that did not specify the $10,000 threshold as an element of the crime. *Id.* at 40.

Moreover, in this case, Wang had ample opportunity to challenge this evidence. *Id.* at 41. For these reasons, it is clear that even though evidence of loss was not required for conviction, it was not beyond the limits of the Board's review

22

as it deliberated on whether a crime is an aggravated felony under the INA.

But Wang's argument goes further, demanding that we scrutinize whether the Government's reliance on this particular District Court judgment to meet its burden of proof is consistent with the INA's definition of loss. *See, e.g., Singh,* 677 F.3d at 511.[18] To justify the inquiry Wang segregates his unauthorized purchases of futures contracts (uncharged conduct) from his false reports on those purchases (conduct grounding his conviction) and argues that his employer's loss resulted only from his purchases, not his reports. The point of Wang's facile distinction is to tie the loss exclusively to uncharged conduct in the hope that, in this case, it will place it outside the definition of loss under the INA, even if it was relevant conduct for purposes of sentencing. Among the difficulties for Wang is that the Government presented this same evidence differently and more compellingly.

---

[18]In *Singh*, we said*:* "The statutory language of subparagraph (M)(i) provides no indication that Congress wanted loss to be defined in accordance with the Sentencing Guidelines. As the *Kharana* concurrence observed, the Guidelines and the INA are like "apples and oranges." *See Kharana,* 487 F.3d [1280, 1287 (9th Cir. 2008)] (Wallace, J., concurring). Not only are they written by different bodies (one by a non-legislative commission, one by Congress), but they serve distinctly different purposes (one penological, one civil)." *Singh*, 677 F.3d at 511.

The Government asserts that there is a direct link between Wang's crime and the loss because his false reports covered up his unauthorized purchases. By asserting this connection the Government is not denying that Wang's purchases were part of a causal chain that resulted in a loss. Rather, it is simply stating that the $2.2 million loss is undeniably tethered to the conduct for which Wang was convicted.[19] This is a convincing argument primarily because it avoids strained distinctions, and it plainly describes "the specific way in which [the] offender committed the crime on [this] specific occasion." *Nijhawan*, 557 U.S. at 34. For these reasons, we are confident that the Board properly considered evidence of the $2.2 million loss, and that the Government met its burden of providing clear and convincing evidence that this loss is tied to the crime for which Wang was convicted.

## IV.

For all of these reasons, we will grant Wang's Petition for Review as to the Board's determination that he committed a crime involving fraud or deceit. We will remand this case to the Board for further proceedings consistent with this opinion.

---

[19] The presentence investigation report substantiates this. Moreover, as we observed *supra*, n. 14, Wang has never challenged the fact that his former employer incurred a $2.2 million loss from liquidating the contracts he purchased. He only has disputed that the loss is tied to his false report conduct.