**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-3001
_____

CHIAO FANG KU,
AKA Chiao Fang Ronan, AKA Anna Ronan,

Petitioner

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA,

Respondent

_____

On Petition for Review of an Order of the
Board of Immigration Appeals
(Agency No. A077-160-352)
Immigration Judge: Walter A. Durling

_____

Argued September 12, 2018

_____

Before: JORDAN, VANASKIE[*], and NYGAARD, *Circuit Judges*

_____

[*] The Honorable Judge Vanaskie transmitted the opinion to the Clerk for filing prior to retiring from the bench on January 1, 2019. Due to the intervening holiday, the opinion has been entered on the docket by the Clerk this day.

(Opinion Filed: January 3, 2019)

Thomas M. Griffin        [**Argued**]
Surin & Griffin
718 Arch Street
Suite 701N
Philadelphia, PA 19106
        *Counsel for Petitioner*

Chad A. Readler, Acting Assistant Attorney General
Nancy E. Friedman, Senior Litigation Counsel
Justin R. Markel, Senior Litigation Counsel
Gregory A. Pennington, Jr.     [**Argued**]
United States Department of Justice
Office of Immigration Litigation
Civil Division
P.O. Box 878
Ben Franklin Station
Washington, DC 20044
        *Counsel for Respondent*

————————————

OPINION

————————————

VANASKIE, *Circuit Judge*.

Seeking to remain in this country, Chiao Fang Ku petitions for review of a final order of removal issued by the Board of Immigration Appeals ("BIA" or "Board"). The Board determined that Ku had committed an aggravated felony

under 8 U.S.C. § 1101(a)(43)(M)(i) because her prior conviction for wire fraud constituted an offense involving fraud or deceit in which the loss to the victims exceeded $10,000. The Board also found that Ku's wire fraud conviction constituted a "crime involving moral turpitude" under 8 U.S.C. § 1182(a)(2)(A)(i)(I) such that, without a waiver, she is ineligible for an adjustment of status. Although the Immigration Judge ("IJ") granted Ku a waiver of inadmissibility under 8 U.S.C. § 1182(h)(1)(B) based on the extreme hardship that her deportation would cause her U.S. Citizen children, the Board reversed that decision. Ku challenges each of the Board's decisions.

In *Nijhawan v. Holder*, 557 U.S. 29 (2009), the Court held that determination of whether a fraud offense involved loss to the victims of $10,000 or more requires a circumstance-specific approach, allowing the immigration court to review both the charging document and sentencing-related materials to determine the loss amount attributable to the offense. On the facts of this case, we find that the undisputed loss to the victims of well over $10,000 was sufficiently tethered to Ku's wire fraud conviction such that the conviction qualifies as an aggravated felony. Furthermore, we find no error in the Board's determination that wire fraud constitutes a crime of moral turpitude. Lastly, regarding the waiver of admissibility, we do not have jurisdiction to review the discretionary denial of a waiver under § 212(h) of the INA. Accordingly, we will deny in part and dismiss in part Ku's petition for review.

I.

Ku is a native and citizen of Taiwan. She was admitted to the United States in 1997 and gained status as a lawful permanent resident in 2002. In 2014, Ku was charged with a

3

single count of wire fraud, in violation of 18 U.S.C. § 1343. Ku waived her right to an indictment and was charged by information only. The Information alleged that Ku was tasked with managing the finances of her in-laws, E.R. and M.R, and that she was provided access to her in-laws' bank accounts in connection with this role. The Information further alleged that, between May 2008 and July 2013, Ku defrauded her in-laws by using her access to their accounts to take money from them for her personal use. In particular, it alleged that Ku: (1) transferred funds from her in-laws' accounts to her own accounts; (2) withdrew funds from her in-laws' accounts as cash; (3) made payments from her in-laws' accounts to pay off her personal credit cards; (4) wrote and cashed checks payable to herself by forging her mother-in-law's signature; and (5) fraudulently applied for and obtained credit cards in her mother-in-law's name and used them for her own purposes. The Information alleged that, in total, Ku stole more than $950,000 from her in-laws.

These allegations were incorporated by reference into the sole count of the Information, which alleged that, on or about November 7, 2011, Ku,

> having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, did cause writings, signs, signals, pictures, and sounds to be transmitted by means of wire communications in interstate commerce for the purpose of executing such scheme and artifice, to wit: executing an online payment from M.R.'s Sovereign Bank account, ending

4

in 8497, to the defendant's Chase credit card account, ending in 6567, in the amount of $2,290.53.

(App. 590).  The Information further contained forfeiture allegations, which directed that, upon conviction of the sole count of the Information, Ku "forfeit to the United States . . . any property, real or personal, that constitutes, or is derived from, proceeds traceable to the commission of the offense, including but not limited to at least $950,000 in United States currency." (App. 591).

Ku pleaded guilty, pursuant to a plea agreement,[1] to the single count of the Information.  In her sentencing memorandum, Ku, through counsel, acknowledged that she was "now subject to automatic deportation as a result of her conviction in this case."  (App. 740).  Ku was ultimately sentenced to a term of 18 months' imprisonment, followed by one year of supervised release.  The judgment includes a total loss determination of $954,515.71 and orders restitution in that amount.  (App. 582).

After Ku completed her sentence, she was served with a Notice to Appear and placed in removal proceedings.  The Notice to Appear charged Ku with being removable under § 237(a)(2)(A)(iii) of the Immigration and Nationality Act ("INA" or the "Act"), 8 U.S.C. § 1227(a)(2)(A)(iii), as an individual convicted of an aggravated felony as defined in 8 U.S.C. § 1101(a)(43)(M)(i).  The Immigration Judge concluded that Ku was removable as charged because the

---

[1] The plea agreement is not part of the administrative record before us, nor was it in the record before the IJ or BIA.

5

record of conviction substantiated a finding that the wire fraud involved a loss of more than $10,000.

In order to avoid deportation, Ku sought to re-adjust her status based on her U.S. Citizen husband.[2] The Immigration Judge granted Ku's application for a waiver of inadmissibility under § 212(h)(1)(B) of the Act, 8 U.S.C. § 1182(h)(1)(B), based on the extreme hardship that her deportation would cause her U.S. Citizen children, and granted Ku's adjustment of status pursuant to § 245(a) of the INA, 8 U.S.C. § 1255(a).

On appeal, the Board affirmed that the Government demonstrated by clear and convincing evidence that Ku was removable as an aggravated felon as defined at § 1101(a)(43)(M)(i) in that her offense involved fraud or deceit in which the loss to the victims exceeded $10,000. In doing so, the Board noted that the Information alleged that Ku stole more than $950,000 in funds belonging to her in-laws, and that this allegation was incorporated by reference into the count to which Ku pleaded guilty. It also observed that the Information also contained a forfeiture allegation stating that, upon conviction, Ku would forfeit over $950,000 in currency. Finally, the Board considered relevant that the Judgment of Conviction found a total loss of over $950,000 and ordered restitution in that amount.

The Board further concluded that Ku's conviction was for a crime involving moral turpitude, making her inadmissible under § 212(a)(2)(A)(i)(I) of the INA, 8 U.S.C. § 1182(a)(2)(A)(i)(I), such that she required a § 212(h) waiver

_____

[2] Ku's present husband is not the man to whom she was previously married and whose parents are the elderly in-laws she defrauded.

6

in order to adjust her status. *See* 8 U.S.C. § 1255(a) (providing for adjustment of status of certain aliens to that of an alien lawfully admitted for permanent residence); *see also* 8 U.S.C. § 1182(h)(1)(B) (providing for waiver of inadmissibility at the discretion of the Attorney General). Although it acknowledged the hardship posed to her family, the Board ultimately found that, given the severity of her crime, Ku did not merit a § 212(h) waiver. It accordingly vacated the decision of the IJ and denied Ku's applications for a § 212(h) waiver and for adjustment of status. Ku timely filed a petition for review.

## II.

Although we have jurisdiction to review final orders of removal under 8 U.S.C. § 1252(a),[3] "no court shall have

---

[3] We have taken a broad view of what constitutes a "final order of removal" under § 1252. *Higgs v. Att'y Gen.*, 655 F.3d 333, 337–38 (3d Cir. 2011). "[A]n order is final for jurisdictional purposes when a removability determination has been made that is no longer appealable to the BIA, regardless [of] whether a formal order of removal has been entered." *Id.* (quoting *Yusupov v. Att'y Gen.*, 518 F.3d 185, 195 (3d Cir. 2008)); *see also Shehu v. Att'y Gen.*, 482 F.3d 652, 656 (3d Cir. 2007) ("[D]enial of a . . . petition for asylum, withholding of removal, and relief under the [Convention Against Torture] constitutes 'a final order of removal' within the meaning of [§ 1252], [because] the alien is entitled to no further process before deportation."). Here, although the Board did not explicitly order Ku removed to Taiwan, it found her removable and denied her application for adjustment of status, her only petition for relief. (App. 5). Furthermore, the Board sustained DHS's appeal, which requested that Ku be ordered removed to Taiwan. Accordingly, for the purposes of this appeal, we

jurisdiction to review any final order of removal against an alien who is removable by reason of having committed [an aggravated felony]." 8 U.S.C. § 1252(a)(2)(C). "We do, however, have jurisdiction to examine 'constitutional claims or questions of law.'" *Fan Wang v. Att'y Gen.*, 898 F.3d 341, 343 (3d Cir. 2018) (quoting *Catwell v. Att'y Gen.*, 623 F.3d 199, 205 (3d Cir. 2010); 8 U.S.C. § 1252(a)(2)(D)). Therefore, we have authority to take up the issue, applying plenary review, of whether Ku's conviction qualifies as an aggravated felony because it is "a purely legal question, and one that governs our own jurisdiction." *Id.* (quoting *Valansi v. Ashcroft*, 278 F.3d 203, 207 (3d Cir. 2002)). We also review *de novo* the legal question of what elements of a federal criminal statute implicate moral turpitude, while affording *Chevron* deference to the Board's definition of "moral turpitude." *Knapik v. Ashcroft*, 384 F.3d 84, 88 (3d Cir. 2004).

III.

On appeal, Ku challenges all three aspects of the BIA's order. First, she contends that the BIA incorrectly determined that her wire-fraud conviction involved a loss of more than $10,000 by relying on evidence that was not sufficiently tethered to the sole count of conviction.[4] Second, Ku argues

_____

consider the Board's order to be a final order of removal. The Government's motion to remand this case to the Board for issuance of an order directing that Ku be removed to Taiwan and to allow the IJ to make additional findings on removability will be denied as moot.

[4] We note that Ku does not challenge—and did not challenge before the IJ or the Board—that her wire fraud

8

that the Board erred in finding that her wire-fraud conviction was for a crime involving moral turpitude because the statute of conviction does not require a showing of intent. Third, Ku asserts that the BIA applied the incorrect legal standard in reversing the IJ's grant of a discretionary waiver of inadmissibility. We reject all three of Ku's challenges and therefore deny the petition for review.

A.

Section 237(a)(2)(A)(iii) of the INA, as amended, provides that "[a]ny alien who is convicted of an aggravated felony at any time after admission is deportable." 8 U.S.C. § 1227(a)(2)(A)(iii). The Act defines "aggravated felony," in relevant part, as an offense that "involves fraud or deceit in which the loss to the victim or victims exceeds $10,000." 8 U.S.C. § 1101(a)(43)(M)(i).

In *Nijhawan v. Holder,* the Supreme Court addressed the issue of whether the $10,000 threshold of the aggravated felony statute "refers to an element of a fraud statute or to the factual circumstances surrounding commission of the crime on a specific occasion." 557 U.S. at 33. The Court adopted the latter interpretation, characterizing the review as examining "the specific way in which an offender committed the crime on a specific occasion." *Id.* at 34. The Court distinguished the "circumstance-specific approach" to be used in determining whether a crime "involves fraud or deceit in which the loss to the victim or victims exceeds $10,000" from the "categorical approach" used in determining whether a crime is a "violent felony" under the Armed Career Criminal Act ("ACCA"), 18

conviction "involves fraud or deceit" under 8 U.S.C. § 1101(a)(43)(M).

9

U.S.C. § 924(e). *Id.* at 34–40. It also rejected the use of the so-called "modified categorical approach" employed in some contexts, which would limit an IJ's consideration to charging documents, jury instructions, special jury findings, or some equivalent judge-made findings and—in the case of a guilty plea—to the written plea documents or plea colloquy. *Id.* at 41. While the Supreme Court acknowledged that "the statute foresees the use of fundamentally fair procedures," it rejected the argument that fairness requires such evidentiary limitations. *Id.* Accordingly, it found "nothing unfair" about the IJ's reliance upon the defendant's stipulation and the district court's restitution order to determine that the crime at issue was an "aggravated felony" under § 1101(a)(43)(M)(i). *Id.* at 42–43.

Since *Nijhawan*, we have consistently applied the circumstance-specific approach to determine the amount of loss in "aggravated felony" cases. *See, e.g.*, *Kaplun v. Att'y Gen.*, 602 F.3d 260, 265–66 (3d Cir. 2010); *Doe v. Att'y Gen.*, 659 F.3d 266, 274–76 (3d Cir. 2011). Most recently, we addressed the issue in *Fan Wang*, in which we reviewed "not only those documents that may be considered in a modified categorical approach (the indictment, plea agreement, and judgment)," but also others, including "the presentence investigation report and any sentencing-related material." 898 F.3d at 348–49 (citations and internal quotation marks omitted). Relying on *Nijhawan*, we reasoned that consideration of such materials "is appropriate so long as the petitioner has been given a 'fair opportunity' to challenge the Government's claim." *Id.* at 349 (quoting *Nijhawan*, 557 U.S. at 41). Accordingly, we determined that the Board did not go beyond the bounds of proper review by examining the record—including the sole count of the superseding information, the

plea colloquy, the presentence investigation report, the "total loss" specified in the judgment, and the restitution order—to determine whether the petitioner's prior conviction was an "aggravated felony." *Id.* at 349–50. In determining the proper amount of loss in that case, we were persuaded by the Government's argument that the loss amount listed in the judgment and restitution order was "undeniably tethered" to the conduct for which the petitioner was convicted. *Id.* at 351.

We consider the loss to the victims in this case—as evidenced by the Information, Judgment, and Restitution Order—to be sufficiently tethered to the count of conviction such that Ku's conviction was an aggravated felony. Paragraphs 1 through 10 of the Information allege that Ku stole more than $950,000 in funds belonging to her in-laws, and these paragraphs were incorporated by reference into the count to which Ku pleaded guilty. Furthermore, the forfeiture allegation contained in the Information states that, upon conviction, Ku would forfeit the "proceeds traceable to the commission of the offense, including but not limited to at least $950,000 in United States currency." (App. 591). Finally, the Judgment of Conviction indicates a loss of $954,515.71 and orders restitution in that amount. Each of these documents is reviewable under the circumstance-specific approach laid out by the Supreme Court in *Nijhawan*. Together, they provide clear and convincing evidence that Ku's offense involved a loss of over $10,000. Nonetheless, we briefly addresses Ku's arguments to the contrary, all of which lack merit.

1.

First, Ku contends that the circumstance-specific approach described in *Nijhawan* does not apply in her case because the single count of the Information made clear that it

11

was for the specified amount of $2,290.53.  She urges us to read *Nijhawan* to have kept intact the modified categorical approach for cases in which the charging document contains a clear indication of the loss amount.  Under the modified categorical approach, she contends, the Board was correct in reviewing the Information but, because the count of conviction contains a loss amount of $2,290.53, the Board should have stopped there.

Contrary to Ku's assertion, *Nijhawan* does not stand for the proposition that, when the count of conviction contains a loss amount, immigration officials must look no further.  The Supreme Court explicitly rejected the use of the modified categorical approach in determining whether a prior conviction is an aggravated felony under § 1101(a)(43)(M)(i).  *Nijhawan*, 557 U.S. at 41–42; *see also Kaplun*, 602 F.3d at 265–66 (interpreting *Nijhawan*).  Rather, it determined that the circumstance-specific approach is required because the aggravated felony statute "refers to the particular circumstances in which an offender committed a (more broadly defined) fraud or deceit crime on a particular occasion," and not to an element of the offense.  *Nijhawan*, 557 U.S. at 32.  Noting that the Government in immigration proceedings is held only to a "clear and convincing" burden of proof, and not "beyond a reasonable doubt," the Supreme Court found "nothing unfair about [an IJ] rel[ying] upon earlier sentencing-related material"—in that case a sentencing stipulation and restitution order.  *Id.* at 42–43.  It also noted that "the sole purpose of the aggravated felony inquiry is to ascertain the nature of a prior conviction; it is not an invitation to relitigate the conviction itself."  *Id.* (internal quotation marks omitted).

Nothing in *Nijhawan* suggests that the circumstance-specific approach applies in some cases but not others, or that

the documents reviewable under that approach vary from case to case. Furthermore, we have consistently interpreted *Nijhawan* as allowing an IJ, in determining the loss amount, to look beyond the charging document to sentencing-related materials. *See Kaplun*, 602 F.3d at 265–66; *Fan Wang*, 898 F.3d at 348–49. Ku has not persuaded us that our reading is incorrect.

2.

Second, Ku contends that, because her conviction was for "a single act of a $2,290.53 on-line transfer," the losses she caused through other acts and transactions are not sufficiently "tethered" to the count of conviction for purposes of the aggravated felony statute. (Petitioner's Br. at 27). In doing so, Ku asks us to read the Information as charging her in Count One with a "scheme and artifice to defraud" her in-laws of $2,290.53, and not as charging her with one instance of wire fraud that was part of a broader "scheme and artifice to defraud" her in-laws of over $950,000. However, such an interpretation is inconsistent with the language of the Information. In Count One, the Government "re-alleges and incorporates by reference" the first eight paragraphs, which allege that, over five years, Ku defrauded her in-laws of more than $950,000 by transferring funds from their accounts to her own accounts, withdrawing funds as cash, making payments to credit card companies for charges she incurred, and writing and cashing checks payable to herself. (App. 588–90). The explicit incorporation of those paragraphs into the count to which Ku pleaded guilty supports an interpretation of the count itself as describing Ku's "scheme and artifice to defraud" her in-laws of more than $950,000.

13

We are similarly unpersuaded by Ku's contention that, because Paragraphs 1 through 8 of the Information describe conduct that does not necessarily amount to wire fraud, such conduct cannot count toward the total loss resulting from her conviction. It is incontrovertible that the "scheme and artifice to defraud" charged in Count One of the Information encompassed the whole course of Ku's unlawful conduct, including the one incident in which Ku committed wire fraud in the amount of $2,390.53, and which resulted in a total loss of over $950,000. In short, because Ku pleaded guilty to committing wire fraud as part of a scheme to defraud her in-laws of more than $950,000, the total loss amount is, to use our language from *Fan Wang*, "undeniably tethered" to her wire fraud conviction.

3.

Finally, Ku contends that the single-count Information to which she pleaded guilty is part of the "justice package" worked out between her and the Government and urges the Court to defer to that agreement. (Petitioner's Br. at 35). In doing so, Ku relies on our opinion in *Alaka v. Attorney General*, 456 F.3d 88 (3d Cir. 2006). However, the facts of this case make it distinguishable from *Alaka*.

In *Alaka*—which we decided prior to *Nijhawan*[5]—we held that the IJ erred by considering the amount of intended

---

[5] Because *Alaka* was decided prior to the Supreme Court's decision in *Nijhawan*, its application of the modified categorical approach to the aggravated-felony analysis does not affect our decision. However, to the extent that *Alaka* stands for the proposition that an IJ may not consider dismissed

14

loss for all of the charges against the petitioner rather than the single count for which she was convicted. *Alaka*, 456 F.3d at 106. The petitioner had been indicted on three counts for conduct involving fraudulent checks, but was convicted of only one count, for which the actual loss was $4,716.68. *Id.* at 92. The sentencing court nonetheless held that the petitioner's conduct was part of a "common scheme or plan," and therefore found the total intended loss to be nearly $50,000. *Id.* It ordered her to pay $4,716.68 in restitution. *Id.* In subsequent immigration proceedings, the IJ concluded that the petitioner had been convicted of an aggravated felony on the ground that the intended loss was more than $10,000. *Id.* at 105, n.27. On appeal, we determined that, while the IJ properly considered the factual findings of the sentencing report in determining whether the offense was an aggravated felony, the loss amount tied to the dismissed charges was not properly considered as part of the aggravated-felony analysis. *Id.* at 106–08. In doing so, we noted that "the plain and unambiguous language of the statute . . . predicates removal on a *convicted* offense resulting in losses greater than $10,000," thereby foreclosing inclusion of losses stemming from unconvicted offenses. *Id.* 106–07 (citations omitted). Furthermore, we considered that, because it is "the *plea agreement* that establishes the offense for which the defendant will be *convicted*, it is to that agreement, and not the indictment or the sentence, that we look in determining the intended loss." *Id.* at 107. The petitioner "unmistakably pled guilty to one count, and the plea agreement plainly documented that loss at less than $10,000." *Id.* at 108 (citations and alterations omitted). Because the plea agreement "spell[ed] it out for us in black and white," we concluded that the plea

---

charges when calculating the loss attributable to the conviction, it remains good law.

agreement alone established the loss amount, and "not . . . the loss charged in the indictment, tabulated for restitution purposes, or calculated for sentencing." *Id.* (citations omitted).

Here, in stark contrast to the petitioner in *Alaka*, the record before us contains no plea agreement, and certainly not one which explicitly spells out the loss amount to which Ku pleaded guilty. Instead, Ku urges us to find that, based on the fact that the Government could have charged her with a much longer list of crimes but did not, the loss amount as indicated in Count One was part of an explicit bargain between her and the Government. However, this argument is based on pure conjecture. Absent a clear and unmistakable indication of loss in a written plea agreement, we are left with only the Information, Judgment, and Restitution Order to determine the loss attributable to Ku's conviction. As explained above, these documents, taken together, provide clear and convincing evidence that the loss amount attributable to Ku's wire fraud conviction exceeded $10,000, and Ku has provided no plea agreement or any other document to the contrary.[6]

---

[6] The sentencing court in *Alaka* calculated the total loss amount based on the "common scheme or plan," which, it considered, included both the count of conviction and the dismissed counts, and we considered the IJ's reliance on that calculation to be in error in light of the plea agreement. 456 F.3d at 106. But this does not help Ku. As explained above, the wire fraud count to which Ku pleaded guilty was based in part on her "scheme and artifice to defraud" her in-laws of over $950,000. (App. 590). Unlike the sentencing court in *Alaka*, the sentencing court in this case did not base its loss calculation on any acts that were not explicitly incorporated into the count of conviction.

16

Ku's argument that this Court should respect the "justice package" between her and the Government also touches on the Supreme Court's landmark holdings in *Padilla v. Kentucky*, 559 U.S. 356 (2010), and *Descamps v. United States*, 570 U.S. 254 (2013), both of which, she argues, counsel toward respecting agreements between criminal defendants and the Government with respect to the collateral consequences of a conviction. But this line of argument merely highlights another critical shortcoming of Ku's case. To the extent Ku argues that the Information was designed specifically to avoid immigration consequences, there is no evidence in the record to support such a finding. Indeed, Ku's attorney indicated in her sentencing memorandum that Ku "is now subject to automatic deportation as a result of her conviction in this case." (App. 740). This statement, while not conclusive, certainly undermines any assertion that the "justice package" referred to by Ku was designed to avoid an aggravated felony conviction. Indeed, absent any other evidence in the record to the contrary, the sentencing memorandum supports a finding that, at the time of her guilty plea, Ku understood that she was pleading guilty to an aggravated felony.

B.

Having concluded that the Board did not err in finding that Ku was convicted of an aggravated felony, we turn to the question of whether Ku's conviction constituted a "crime involving moral turpitude" under the INA. Ku argues that wire fraud is not a "crime involving moral turpitude" under 8 U.S.C. § 1182(a)(2)(A)(i)(I) because it does not include as an element the specific intent to defraud. This is incorrect.

17

The statute provides that a person is guilty of wire fraud if, "having devised or intending to devise any scheme or artifice to defraud," that person "transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice." 18 U.S.C. § 1343. Courts have long treated fraud crimes as "involving moral turpitude." *Jordan v. De George*, 341 U.S. 223, 232 (1951) ("[T]he decided cases make it plain that crimes in which fraud was an ingredient have always been regarded as involving moral turpitude."); *Singh v. Att'y Gen.*, 807 F.3d 547, 550 (3d Cir. 2015) ("Crimes . . . involving allegations of dishonesty or fraud fall well within the recognized definition of 'crimes involving moral turpitude.'"). Furthermore, we have also consistently read the wire fraud statute as containing the element of specific intent. *See, e.g.*, *United States v. Andrews*, 681 F.3d 509, 518 (3d Cir. 2012) ("To prove wire fraud, the Government must establish (1) the defendant's knowing and willful participation in a scheme or artifice to defraud, (2) *with the specific intent to defraud*, and (3) the use of . . . interstate wire communications in furtherance of the scheme.") (internal quotation marks omitted) (emphasis added).

Seeking to persuade us to revisit these tenets, Ku asks us to read the statutory terms "having devised" and "intending to devise" as disjunctive means of committing wire fraud, the latter containing the *mens rea* of intent, and the former eschewing any *mens rea* at all. But the language of the statute does not lend itself to such an interpretation. The specific intent requirement is contained in the latter part of the statute— "for the purpose of executing [a] scheme or artifice [to defraud]"—and must be proved regardless of whether the

18

person made the transmission after "having devised" or while "intending to devise" the scheme to defraud. 18 U.S.C. § 1343. Plainly read, the language Ku seizes on, "having devised or intending to devise," refers not to the requisite *mens rea* but to the temporal relationship between the formation of the fraud scheme and the transmission itself. Either way, the person must have made the transmission *for the purpose of executing* the fraud scheme in order to be convicted.

Ku's statutory interpretation argument holds no weight. Accordingly, we see no need to revisit the long-held tenet that fraud crimes—including wire fraud—are crimes involving moral turpitude under the INA.

C.

Finally, Ku asks us to find that the Board committed error in its reversal of the IJ's finding that she was eligible for a discretionary waiver of inadmissibility based on the hardship her deportation would cause her U.S. citizen children. However, we lack jurisdiction over the Board's decision on this point.

The INA provides that an alien is inadmissible to the United States if she has been convicted of a crime involving moral turpitude. 8 U.S.C. § 1182(a)(2)(A)(i)(I). The Act also provides, however, that the Attorney General may waive inadmissibility to allow an applicant to obtain adjustment of status under § 1182(h), "if the alien is a spouse, parent, or child of a United States citizen . . . and can show that denial of admission would cause extreme hardship to the citizen . . . ." *De Leon–Reynoso v. Ashcroft*, 293 F.3d 633, 637 (3d Cir. 2002). The authority to waive one or more grounds of inadmissibility is vested solely in the Attorney General and "no

19

court shall have jurisdiction to review" a decision to deny such a request. 8 U.S.C. § 1252(a)(2)(B)(i).

We may, however, review "constitutional claims or questions of law raised upon a petition for review . . . ." *Id.* at § 1252(a)(2)(D). Our jurisdiction in that respect is "narrowly circumscribed" in that it is limited to "colorable claims or questions of law." *Cospito v. Att'y Gen.*, 539 F.3d 166, 170 (3d Cir. 2008) (per curiam) (quotation marks and citation omitted). While "[t]he question of our jurisdiction over a colorable legal claim does not turn on whether that claim is ultimately meritorious . . . , a party may not dress up a claim with legal clothing to invoke this Court's jurisdiction." *Pareja v. Att'y Gen.*, 615 F.3d 180, 187 (3d Cir. 2010) (citations omitted).

Ku argues that we have jurisdiction to consider her petition for review on the waiver issue because it presents a question of law, namely whether the Board applied the proper legal standard in making the discretionary determination. But Ku's argument boils down to her contention that the Board failed to consider certain equities relevant to the hardship determination. As we have consistently held, "arguments such as that an Immigration Judge or the BIA incorrectly weighed evidence, failed to consider evidence or improperly weighed equitable factors are not questions of law under § 1252(a)(2)(D)." *Jarbough v. Att'y Gen.*, 483 F.3d 184, 189 (3d Cir. 2007). Because the substance of Ku's petition for review amounts to contesting the weight the Board should have given to the positive equities of her case, we do not have jurisdiction over it and will dismiss in part that aspect of the petition.

IV.

20

For the foregoing reasons, we will deny in part and dismiss in part Ku's petition for review, and we will deny as moot the Government's motion to remand.