FOR PUBLICATION

FILED

UNITED STATES COURT OF APPEALS

OCT 31 2022

FOR THE NINTH CIRCUIT

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

GIOVANNY HERNANDEZ,

Petitioner,

v.

MERRICK B. GARLAND, Attorney General,

Respondent.

No.    20-72138

Agency No. A200-153-571

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted May 18, 2022
Pasadena, California

Before:  Andrew J. Kleinfeld, Eric D. Miller, and Daniel P. Collins, Circuit Judges.

Opinion by Judge Miller

# SUMMARY[*]

## Immigration

Denying Giovanny Hernandez's petition for review of a decision of the Board of Immigration Appeals, the panel concluded that the agency did not commit legal error in determining that Hernandez's California conviction for assault with a deadly weapon was for a particularly serious crime, making him ineligible for asylum or withholding of removal, and that substantial evidence supported the agency's determination that he was not entitled to protection under the Convention Against Torture.

Hernandez contended that in determining that his conviction for assault with a deadly weapon was for a particularly serious crime, the immigration judge relied on improper evidence by admitting his Form I-213 (Record of Deportable/Inadmissible Alien). The Form I-213 stated that the Department of Homeland Security officer had reviewed the arresting officer's probable cause declaration from Hernandez's conviction, and that the declaration reported that Hernandez had "attempted to stab the victim with a knife multiple times." The panel explained that, as an authenticated government-prepared document, the Form I-213 is presumed to be reliable in the absence of evidence to the contrary presented by the alien. The panel rejected Hernandez's argument that the presumption of reliability applies only for the purpose of satisfying the government's initial burden of proving removability, explaining that Forms I-213 are entitled to a presumption of reliability because of their general characteristics as government-prepared documents, and that those characteristics exist regardless of the purpose for which the form is used.

Hernandez also argued that admission of the Form I-213 was not fundamentally fair because he was not given an opportunity to cross-examine the arresting officer or the DHS officer who prepared the form. The panel wrote that Hernandez did not offer any suggestion—either before the agency or before this court—that the information in the Form I-213 was incorrect. Thus, because Hernandez failed to offer any reason to doubt the accuracy of the information in the form, DHS had no obligation to bring the state and federal government-officer declarants to the hearing

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

to establish uncontested facts. The panel further concluded that even if the agency had erred in relying on the Form I-213, Hernandez could not show prejudice because the outcome of the proceeding could not have been affected by requiring the declarants to testify to those uncontested facts.

The panel concluded that the record did not support Hernandez's contention that the agency failed to consider the type of sentence imposed, explaining that in discussing the relevant factors, it was sufficient that the immigration judge and Board expressly stated that Hernandez was sentenced to 240 days in jail.

Turning to Hernandez's CAT claim, the panel held that the incidents of harm Hernandez endured at the hands of Mexican police, including: (1) being punched once in the stomach; (2) being hit in the legs with a large stick; (3) being groped and having his hair cut by an undercover officer; and (4) being taken to a desert, kicked, and forced to walk home, did not rise the level of torture. The panel also held that substantial evidence supported the agency's determination that Hernandez failed to show government acquiescence to any of his sexual assaults by private actors.

The panel concluded that Hernandez failed to show that the Board overlooked probative evidence concerning the experience of sexual minorities and the mentally ill in Mexico. The panel explained that in reviewing the Board's order, the court applies a presumption that the Board did review the record, and if evidence is neither highly probative nor potentially dispositive, the Board need not expressly discuss it. The panel wrote that the record revealed that the Board did consider evidence of sexual violence against members of the LGBT community in Mexico, but simply reached a different overall conclusion. The panel also explained that the Board was under no obligation to discuss a declaration by Professor Nielan Barnes on conditions in Mexico, because the report provided general country-conditions evidence duplicative of other evidence in the record that the Board considered, and it did not provide information specific to Hernandez, nor offer an opinion as to Hernandez's particular likelihood of torture if removed. Thus, it was neither highly probative nor potentially dispositive.

The panel concluded that the Board also adequately considered record evidence concerning the experience of mentally ill individuals in Mexico. The panel wrote that the record did not support Hernandez's arguments that the Board relied on factual inaccuracies in finding that he could obtain medication in Mexico, that he is unlikely to be institutionalized in Mexico, and that healthcare workers and the police would not intentionally subject him to torture. The panel also did not agree with Hernandez that the agency failed to consider evidence that Mexican healthcare

workers and police specifically target mentally ill individuals for torture. Rather, the immigration judge acknowledged that the record showed that some institutionalized patients have suffered sexual abuse but determined that because Hernandez is unlikely to be institutionalized, the record did not establish that he would more likely than not be subjected to such treatment. The immigration judge also considered the evidence of higher arrest and incarceration rates among mentally ill individuals but determined that there was insufficient evidence that this resulted in torture or was the result of a specific intent to torture mentally ill individuals. Thus, the agency did not misstate or ignore Hernandez's evidence; it simply reached a different conclusion.

Finally, the panel concluded that the record did not support Hernandez's assertion that the agency erred by evaluating each source of torture separately and failing to consider their combined probability. Rather, the immigration judge specifically aggregated the risks of torture, described Hernandez's various theories of potential torture and acknowledged the possibility that any or all of the foregoing may occur, but concluded that that possibility fell well short of the standard of proof required for protection under CAT. Although the Board did not specifically address the combined probability of torture from different sources, the panel explained that the Board's discussion of the CAT claim contained nothing to suggest that the Board had not adopted that aspect of the immigration judge's reasoning.

## COUNSEL

Hannah K. Comstock (argued), Iliana A. Gomez, Caitlin Anderson, and Carson Scott, Immigrant Defenders Law Center, Los Angeles, California; for Petitioner.

Sunah Lee (argued), Senior Trial Attorney; Timothy G. Hayes, Senior Litigation Counsel; Bryan Boynton, Principal Deputy Assistant Attorney General; Civil Division/Office of Immigration Litigation, Washington, D.C.; for Respondent.

MILLER, Circuit Judge:

Giovanny Hernandez entered the United States without authorization, and after being convicted in California state court of assault with a deadly weapon, he was removed to Mexico. He later reentered the United States and was again removed. After Hernandez entered the United States for a third time, he was yet again placed in removal proceedings, and he applied for asylum, withholding of removal, and protection under the Convention Against Torture (CAT).

An immigration judge denied relief on all claims. The Board of Immigration Appeals then dismissed Hernandez's appeal, prompting this petition for review. We conclude that the agency did not commit legal error in determining that Hernandez's state-court conviction was for a particularly serious crime, making him ineligible for asylum or withholding of removal. And substantial evidence supports the agency's determination that he is not entitled to CAT relief. We deny the petition for review.

I

The immigration judge found Hernandez to be credible and "afford[ed] his testimony full evidentiary weight." We therefore set out the facts as Hernandez described them.

Hernandez, a native and citizen of Mexico, was brought to the United States by his family without authorization in 1991, when he was eight months old.

1

Hernandez spent most of the next 21 years living with his family in California. During his childhood, he developed schizophrenia; he experiences paranoid delusions as well as hallucinations. He is able to manage his symptoms with medication.

In 2012, Hernandez was convicted in California state court of assault with a deadly weapon and was sentenced to 240 days in jail and three years of probation. After serving his sentence, Hernandez was removed from the United States. Hernandez reentered the United States the next year, and in 2015 he was again removed.

The next year, Hernandez again reentered the United States. After an arrest in California for resisting a peace officer and for possession of a controlled substance, he was placed into removal proceedings for a third time. Hernandez applied for asylum, withholding of removal, and CAT relief, asserting that he would be persecuted and tortured if returned to Mexico because of his mental illness and because he is bisexual. Due to Hernandez's schizophrenia, the immigration judge conducted a competency review and appointed a qualified representative to assist Hernandez in the proceedings.

Hernandez testified at his hearing about the two years he resided in Mexico following his previous removals. His testimony concerned his mental illness and violence he faced in Mexico.

Hernandez did not obtain treatment for his schizophrenia while in Mexico. His mother attempted to secure medication for him, but she was unable to do so. Hernandez did not know why his mother's efforts were unsuccessful, and Hernandez himself did not seek treatment from Mexico's public health system, which provides indigent individuals with free services, including treatment for mental illness. Hernandez experienced periods of homelessness, but he was not institutionalized.

Hernandez also testified to several violent incidents in Mexico. In Tijuana, a group of unknown individuals pulled him into a van, drove away, and then attempted to rape him. While Hernandez was resisting the attack, a bystander alerted police officers, who stopped the van, thereby interrupting the attempted rape. Hernandez did not inform the officers of the sexual nature of the attack that had occurred inside the van, and he was arrested with the attackers because, as he described it, he "was being really aggressive and fighting." The police put all of the arrestees in the same jail cell, where Hernandez continued to fight with his attackers. The attackers were released after posting bail. Hernandez could not remember whether he spoke with the police about the attack or asked them to press charges. When asked about the incident, Hernandez testified that the police "did their job."

On at least four occasions, other unknown individuals sexually assaulted Hernandez in Tijuana and Acapulco. Hernandez stated that the police were not involved and that he did not report those assaults.

Hernandez testified to several incidents involving violence with the police. First, while waiting for a friend to withdraw money from a bank, Hernandez was accosted by the bank security officer. When the police arrived, Hernandez "threw the officers" but was subdued after one of the officers punched him in the stomach. Second, an undercover police officer groped him and, on one occasion, cut his hair. Third, an officer hit Hernandez in the legs with a large stick. Finally, after Hernandez refused to comply with an officer's order, a group of officers drove him "to a desert," kicked him repeatedly, and forced him to walk home.

After hearing this testimony and reviewing the extensive documentary record submitted by Hernandez, the immigration judge denied the applications for asylum, withholding of removal, and CAT relief. First, the immigration judge found that Hernandez's conviction for assault with a deadly weapon constituted a conviction for a particularly serious crime barring him from asylum or withholding of removal. The immigration judge determined that the crime was particularly serious in part because, according to the arresting officer's probable-cause declaration memorialized in Hernandez's Form I-213 (Record of Deportable/Inadmissible Alien), the conviction was based on Hernandez's attempt

"to stab the victim with a knife multiple times." Hernandez objected to the introduction of the Form I-213, but the immigration judge determined that it was admissible because a Form I-213 is "presumptively reliable" and because Hernandez introduced no evidence to contradict it. Second, the immigration judge denied CAT relief, finding that Hernandez did not establish that he would be more likely than not to be tortured if removed to Mexico.

The Board of Immigration Appeals dismissed Hernandez's appeal. It reasoned that a Form I-213 "is presumptively reliable," and it observed that Hernandez "had notice and opportunity to present evidence challenging statements in the I-213" but had not done so. Relying on the information in the Form I-213, as well Hernandez's testimony, the Board concluded that Hernandez had "engaged in violent and dangerous conduct while intoxicated, resulting in serious injury to another person," and that the crime was particularly serious. The Board also determined that Hernandez was not entitled to CAT relief because "the physical abuse that [he] suffered during several incidents does not constitute past torture," and he had not established that he was more likely than not to be tortured in the future.

## II

An alien is ineligible for asylum or withholding of removal if "the alien, having been convicted by a final judgment of a particularly serious crime,

5

constitutes a danger to the community of the United States." 8 U.S.C. §§ 1158(b)(2)(A)(ii), 1231(b)(3)(B)(ii). An aggravated felony is automatically a "particularly serious crime," *id.* §§ 1158(b)(2)(B)(i), 1231(b)(3)(B), but the agency may determine through adjudication that an offense that is not an aggravated felony is nevertheless a particularly serious crime, *Delgado v. Holder*, 648 F.3d 1095, 1106 (9th Cir. 2011) (en banc). In making that determination, the agency considers "such factors as the nature of the conviction, the circumstances and underlying facts of the conviction, the type of sentence imposed, and, most importantly, whether the type and circumstances of the crime indicate that the alien will be a danger to the community." *Matter of Frentescu*, 18 I. & N. Dec. 244, 247 (B.I.A. 1982).

Deciding whether an offense constitutes a particularly serious crime involves the exercise of discretion, *see Arbid v. Holder*, 700 F.3d 379, 383 (9th Cir. 2012) (per curiam), and Congress has limited our jurisdiction to review the agency's discretionary decisions, *see* 8 U.S.C. § 1252(a)(2)(B)(ii). Accordingly, we may review a particularly-serious-crime determination only for abuse of discretion. *Arbid*, 700 F.3d at 383. Under that standard, we are "limited to ensuring that the agency relied on the 'appropriate factors' and 'proper evidence,'" and we may not "reweigh the evidence and reach our own determination about the crime's seriousness." *Avendano-Hernandez v. Lynch*, 800 F.3d 1072, 1077 (9th Cir. 2015)

6

(quoting *Anaya-Ortiz v. Holder*, 594 F.3d 673, 676 (9th Cir. 2010) (brackets omitted)).

Hernandez contends that the agency made two legal errors in determining that his conviction for assault with a deadly weapon was for a particularly serious crime. First, he argues that the immigration judge relied on improper evidence in admitting his Form I-213. Second, he argues that the agency failed to consider the appropriate factors because it ignored what he calls the "low-level sentence" he received. Neither argument succeeds.

A

The Federal Rules of Evidence do not apply in removal proceedings. *Singh v. Holder*, 638 F.3d 1196, 1209 (9th Cir. 2011). Accordingly, in deciding whether a crime is particularly serious, an immigration judge may consider "all reliable information," including "information outside the confines of a record of conviction," *Anaya-Ortiz v. Holder*, 594 F.3d 673, 677 (9th Cir. 2010) (quoting *Matter of N-A-M-*, 24 I. & N. Dec. 336, 342 (B.I.A. 2007)), so long as it "is probative and its admission is fundamentally fair," *Sanchez v. Holder*, 704 F.3d 1107, 1109 (9th Cir. 2012) (per curiam) (quoting *Espinoza v. INS*, 45 F.3d 308, 310 (9th Cir. 1995)). The erroneous admission of evidence warrants a new hearing only when the alien can demonstrate that the admission prejudiced him, "which means that 'the outcome of the proceeding may have been affected by the alleged

7

violation.'" *Alcaraz-Enriquez v. Garland*, 19 F.4th 1224, 1231–32 (9th Cir. 2021) (quoting *Cinapian v. Holder*, 567 F.3d 1067, 1074 (9th Cir. 2009)).

Hernandez does not dispute that the details of his crime are probative in assessing whether it was a particularly serious crime. The immigration judge drew those details from a Form I-213 (Record of Deportable/Inadmissible Alien). That document, prepared by an officer of the Department of Homeland Security (DHS), sets out basic biographical information about an alien as well as the date and place of his entry into the United States and a narrative that includes facts establishing his removability. In Hernandez's case, the Form I-213 stated that the DHS officer had reviewed "the arresting officer[']s probable cause declaration" from Hernandez's California conviction for assault with a deadly weapon, and that the declaration reported that Hernandez had "attempted to stab the victim with a knife multiple times."

Hernandez argues that the form was unreliable, but we have long held that "information on an authenticated immigration form is presumed to be reliable in the absence of evidence to the contrary presented by the alien." *Espinoza*, 45 F.3d at 310; *see Sanchez*, 704 F.3d at 1109. That is so because we presume "that public officials perform their duties properly without motive or interest other than to submit accurate and fair reports." *Espinoza*, 45 F.3d at 310 (quoting *Keith v. Volpe*, 858 F.2d 467, 481 (9th Cir. 1988)); *see United States Postal Serv. v. Gregory*, 534

8

U.S. 1, 10 (2001) ("[A] presumption of regularity attaches to the actions of Government agencies.").

According to Hernandez, the presumption of reliability applies only for the purpose of satisfying the government's initial burden of proving removability and does not extend to a particularly-serious-crime determination. But as we have explained, we held in *Espinoza* that Forms I-213 are entitled to a presumption of reliability because of their general characteristics as government-prepared documents. 45 F.3d at 310. Those characteristics exist regardless of the purpose for which the form is used. "[N]othing in the language of the 'particularly serious crime' provisions in the INA limits the scope of permissible evidence" on which the agency may rely in making its particularly-serious-crime determination. *Anaya-Ortiz*, 594 F.3d at 678; *see Sanchez*, 704 F.3d at 1109. The Form I-213 was thus a presumptively reliable basis on which the agency could assess the seriousness of Hernandez's crime.

As an applicant for asylum and withholding of removal, Hernandez had the burden of establishing his eligibility by showing that his crime was not particularly serious. *Rendon v. Mukasey*, 520 F.3d 967, 973 (9th Cir. 2008); *see* 8 C.F.R. § 1240.8(d). Hernandez could do that by rebutting the presumption that the Form I-213 is reliable, but he did not do so. Hernandez argues that because the Form I-213 contains statements that came neither from him nor from a government official, it

9

cannot be presumed reliable. In fact, the form contains statements *only* from government officials: It was prepared by a DHS officer, and it reports information from a declaration by the arresting officer. Hernandez offers no other basis for considering the form unreliable.

Hernandez focuses most of his argument on the proposition that the admission of the Form I-213 was not fundamentally fair because he was not given an opportunity to cross-examine the arresting officer or the DHS officer who prepared the form. Hernandez relies on *Alcaraz-Enriquez*, in which we stated that, as a general matter, "the government deprives the alien of a fundamentally fair hearing when it fails 'to make a good faith effort to afford the alien a reasonable opportunity to confront and cross-examine the witness against him.'" 19 F.4th at 1231 (quoting *Saidane v. INS*, 129 F.3d 1063, 1066 (9th Cir. 1997)); *see* 8 U.S.C. § 1229a(b)(4)(B). There, we held that the immigration judge had violated due process in relying on a probation report over the alien's objection. *Alcaraz-Enriquez*, 19 F.4th at 1231. We concluded that the agency's failure "to procure for Alcaraz's cross-examination the witnesses whose testimony was embodied in the probation report and upon whose testimony the [agency] ultimately relied" had "impugned the probation report's reliability and rendered the . . . procedure fundamentally unfair." *Id.* But a key fact in that case was that the alien contested

10

the information in the report: The report contained the testimony of one witness, and Alcaraz specifically "denied that it was 'the way she describes.'" *Id.* at 1228.

*Alcaraz-Enriquez* does not undermine the rule that an alien "may not assert a cross-examination right to prevent the government from establishing *uncontested* facts." *Espinoza*, 45 F.3d at 311 (quoting *Olabanji v. INS*, 973 F.2d 1232, 1234 n.1 (5th Cir. 1992)) (emphasis added). Where the applicant "has offered no evidence to show that the form contains material errors," there is no right to demand cross-examination. *Id.* at 310; *see Sanchez*, 704 F.3d at 1109 (holding that Sanchez was not entitled to cross-examine the Form I-213 preparer because "she provided no basis for the IJ to . . . conclude" that the form was inaccurate); *cf. Bogle v. Garland*, 21 F.4th 637, 651 (9th Cir. 2021) ("In looking at whether proceedings were fundamentally fair . . . , courts may consider whether a petitioner had 'ample opportunity to challenge' the evidence against him but did not." (quoting *Wang v. Attorney Gen.*, 898 F.3d 341, 350 (3d Cir. 2018))).

At no time—either before the agency or before us—has Hernandez offered any suggestion that the information in the Form I-213 is incorrect. As the Board noted, the government filed the form two years before the merits hearing, during which time Hernandez did not submit a copy of the police report or attempt to undermine the information in the form. Hernandez did assert in his administrative appeal that the facts reported in the form "directly conflict with [his] statements,"

11

but he did not elaborate on that assertion, nor has he renewed it here. And, in any case, his testimony before the agency is consistent with that in the form. At his hearing, he admitted to having been convicted of assault with a deadly weapon, explaining that "we had a fight," "I used force against someone," and "we were drinking," none of which contradicts the statement that he repeatedly tried to stab someone. Despite multiple opportunities to do so, Hernandez failed to offer any reason to doubt the accuracy of the information in the form, so DHS had no obligation to bring the state and federal government-officer declarants to the hearing to establish uncontested facts. The agency therefore permissibly relied on the information in the Form I-213.

Finally, even if the agency had erred in relying on the Form I-213, Hernandez cannot show prejudice. In order to obtain relief based on fundamental unfairness, an alien must show prejudice, or, in other words, that "the outcome of the proceeding may have been affected by the alleged violation." *Alcaraz-Enriquez*, 19 F.4th at 1231–32 (citation omitted). But where, as here, the facts at issue are not contested, then the outcome of the proceeding could not have been affected by requiring the declarants to testify to those uncontested facts. *See Espinoza*, 45 F.3d at 311; *Sanchez*, 704 F.3d at 1109; *cf. Angov v. Lynch*, 788 F.3d 893, 902–04 (9th Cir. 2015) (holding that the agency could reasonably credit a

12

document, even though it lacked certain indicia of reliability, because of the "almost complete absence of rebuttal evidence" offered by the alien).

B

Having held that the agency examined "proper evidence," we turn to whether it "relied on the appropriate factors" in its determination. *Flores-Vega v. Barr*, 932 F.3d 878, 884 (9th Cir. 2019) (internal citations and quotations omitted). Hernandez argues that the agency failed to consider "the type of sentence imposed," *Matter of Frentescu*, 18 I. & N. Dec. at 247, because it ignored what he calls his "less-than-low-term sentence." That contention is belied by the record. In discussing the *Frentescu* factors, both the immigration judge and the Board expressly stated that Hernandez was sentenced to 240 days in jail. That was sufficient.

The agency need not engage in a lengthy discussion of every contention raised by a petitioner. Instead, all that is required is "that it consider the issues raised, and announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." *Najmabadi v. Holder*, 597 F.3d 983, 990 (9th Cir. 2010) (quoting *Lopez v. Ashcroft*, 366 F.3d 799, 807 n.6 (9th Cir. 2004)). That is simply an application of the general administrative-law requirement that an agency "articulate a satisfactory explanation for its action," and under that standard, we must "'uphold a decision of

13

less than ideal clarity if the agency's path may reasonably be discerned.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Bowman Transp. Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)). The Board's opinion here was comfortably on the right side of the line separating the "tolerably terse" from the "intolerably mute." *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970).

Hernandez's real objection is not that the agency did not acknowledge the *Frentescu* factors; he objects to how the agency weighed them. We lack jurisdiction to consider that argument. *Avendano-Hernandez*, 800 F.3d at 1077.

## III

Hernandez argues that the Board erred in rejecting his application for CAT relief. To receive deferral of removal under the CAT, an applicant must establish that "it is more likely than not that he or she would be tortured if removed." 8 C.F.R. § 1208.16(c)(2). To constitute torture, an act must inflict "severe pain or suffering," and it must be undertaken "at the instigation of, or with the consent or acquiescence of, a public official." 8 C.F.R. § 1208.18(a)(1). Substantial evidence supports the Board's determination that Hernandez did not establish an entitlement to relief.

## A

Hernandez claims that he suffered past torture in Mexico at the hands of the Mexican police and at the hands of the private actors who sexually assaulted him. The Board found that neither group's actions constituted torture because the conduct of the police did not rise to the level of torture, and the Mexican government did not acquiesce in the sexual assaults by private actors. We uphold both of those determinations.

We first consider the actions of the police. Hernandez identifies four incidents of abuse by police officers: (1) an officer punched him once in the stomach; (2) an officer hit him in the legs with a large stick; (3) an undercover officer cut his hair and groped him; and (4) officers took him "to a desert," kicked him, and forced him to walk home. Those incidents do not constitute torture. Under the CAT regulations, torture is defined as an "an extreme form of cruel and inhuman treatment and does not include lesser forms of cruel, inhuman or degrading treatment or punishment that do not amount to torture." 8 C.F.R. § 1208.18(a)(2). The regulations place a heavy burden on the applicant: Demonstrating torture requires a much greater showing of harm than demonstrating persecution, itself "an extreme concept." *Sharma v. Garland*, 9 F.4th 1052, 1060 (9th Cir. 2021); *see id.* at 1067.

We have previously held that even instances of significant physical abuse did not constitute torture. For example, in *Ahmed v. Keisler*, we upheld the Board's conclusion that the petitioner's showing that he was "beaten on four occasions," resulting "in scars all over his body," did not establish past torture. 504 F.3d 1183, 1188, 1201 (9th Cir. 2007); *see also, e.g.*, *Vitug v. Holder*, 723 F.3d 1056, 1060, 1065–66 (9th Cir. 2013) (holding that five beatings and robberies, "two of [which] were severe," did not qualify as torture); *Kumar v. Gonzales*, 444 F.3d 1043, 1055–56 (9th Cir. 2006) (concluding that "a month-long detention that included severe physical attacks and threats to [the petitioner's] life" did not justify CAT relief). And, most recently, we held that a petitioner who was twice kidnapped and, during one kidnapping, "beaten with brass knuckles that caused hearing damage," had not shown past torture. *Tzompantzi-Salazar v. Garland*, 32 F.4th 696, 700, 706 (9th Cir. 2022).

As the immigration judge observed, the police's actions did not result in "any serious injuries or long-term harm" to Hernandez, and the beatings were less severe than abuse we previously held did not constitute torture. *See Tzompantzi-Salazar*, 32 F.4th at 706; *Ahmed*, 504 F.3d at 1201. Those instances of police abuse, either individually or cumulatively, do not support the conclusion that Hernandez suffered past torture at the hands of the Mexican police. *See Tzompantzi-Salazar*, 32 F.4th at 706; *Ahmed*, 504 F.3d at 1201.

As for the sexual assaults that Hernandez suffered, we have held that rape can constitute torture when it is inflicted by or with the acquiescence of the government. *Akosung v. Barr*, 970 F.3d 1095, 1104–05 (9th Cir. 2020). But Hernandez's attackers were private actors, and substantial evidence supports the Board's conclusion that Hernandez has not shown government acquiescence. *See Nasrallah v. Barr*, 140 S. Ct. 1683, 1692 (2020); 8 U.S.C. § 1252(b)(4)(B).

Acquiescence "requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity." 8 C.F.R. § 1208.18(a)(7). That "does not require actual knowledge or willful acceptance of torture." *Aguilar Ramos v. Holder*, 594 F.3d 701, 705–06 (9th Cir. 2010). But while "awareness and willful blindness will suffice" to show acquiescence, *id.*, "a general ineffectiveness on the government's part to investigate and prevent crime will not," *Andrade-Garcia v. Lynch*, 828 F.3d 829, 836 (9th Cir. 2016); *see Garcia-Milian v. Holder*, 755 F.3d 1026, 1034 (9th Cir. 2014).

Hernandez says that "[w]hen the Mexican Police had the opportunity to protect [him] and hold his aggressors accountable, they failed to do so." He focuses on the attempted rape in the van, asserting that the police "looked on and did nothing." That assertion is not supported, let alone compelled, by the record. As Hernandez testified, the police stopped the van, prevented the attack, and arrested

17

the attackers. Although the police also arrested Hernandez, his own testimony explained why: He admitted that he "was being really aggressive and fighting." In other words, having witnessed fighting in the van, and having heard no explanation from Hernandez about what happened, the police decided to arrest the entire group. That does not compel the finding that, as Hernandez puts it, "the police effectively punished [Hernandez] for being bisexual."

Nor does the record compel the conclusion that the police refused to prosecute the attackers. Instead, Hernandez testified, he never told the police that the attack was an attempted rape. Although Hernandez is correct that we do not require "that an applicant report his alleged torture," *Ornelas-Chavez*, 458 F.3d at 1060, the fact that he did not make the police aware of the nature of the attack supports the Board's finding that the police were not aware of or willfully blind to it, *cf. Andrade-Garcia*, 828 F.3d at 836. In Hernandez's own words, the police "did their job."

Hernandez points to the other rapes he suffered as further evidence of government acquiescence. But Hernandez testified that he did not report those attacks either, and nothing in the record suggests that the police were otherwise aware of them. The Mexican police's failure to prevent or investigate the assaults "because they lacked sufficient information does not compel the conclusion that the police acquiesced in the attack[s]." *Garcia-Milian*, 755 F.3d at 1034.

18

B

Hernandez argues that the agency erred by ignoring highly probative evidence concerning the experience of sexual minorities and the mentally ill in Mexico. We have held that "[w]here the Board does not consider all the evidence before it, either by 'misstating the record [or] failing to mention highly probative or potentially dispositive evidence,' its decision cannot stand." *Castillo v. Barr*, 980 F.3d 1278, 1283 (9th Cir. 2020) (alteration in original) (quoting *Cole v. Holder*, 659 F.3d 762, 772 (9th Cir. 2011)); *see* 8 C.F.R. § 208.16(c)(3). But that does not mean that the Board must individually identify and discuss every piece of evidence in the record. *See Pirir-Boc v. Holder*, 750 F.3d 1077, 1086 (9th Cir. 2014). In reviewing the Board's order, we apply a "presumption that the BIA did review the record." *Fernandez v. Gonzales*, 439 F.3d 592, 603 (9th Cir. 2006). And if evidence is neither "highly probative [n]or potentially dispositive," the Board need not expressly discuss it. *See Castillo*, 980 F.3d at 1283 (quoting *Cole*, 659 F.3d at 772). Hernandez has not shown that the Board overlooked any important evidence.

Hernandez asserts that the Board ignored highly probative evidence concerning the treatment of sexual minorities in Mexico, but the record reveals that the Board did consider that evidence; it simply reached a different overall conclusion. For example, Hernandez argues that the Board failed to consider

"country conditions evidence that Mexican police turn a blind eye to and participate in widespread violence against LGBTQ-persons." In fact, the immigration judge specifically noted "troubling reports of violence towards members of the LGBT community," as well as "reports of police violence towards LGBT individuals," before explaining that, in light of the passage of new legislation in Mexico as well as the deficiencies in Hernandez's evidence, "the record does not demonstrate that police specifically target LGBT individuals for harm," nor does it "establish the frequency with which this type of treatment occurs, or the extent of it that rises to the level of torture." The Board noted the immigration judge's findings on that issue and said that it agreed with them.

According to Hernandez, the Board erred by failing to discuss a declaration by Professor Nielan Barnes on conditions in Mexico. But the Board was under no obligation to discuss the report because it was neither "highly probative [n]or potentially dispositive." *See Castillo*, 980 F.3d at 1283 (quoting *Cole*, 659 F.3d at 772). Professor Barnes's report provided general country-conditions evidence duplicative of other evidence in the record that the Board considered. It did not provide information specific to Hernandez, nor did it offer an opinion as to Hernandez's particular likelihood of torture if removed. *Cf. Cole*, 659 F.3d at 767, 772 (concluding that the Board erred in failing to give "reasoned consideration" to an expert report stating that the petitioner had "a greater than 75% chance of being

20

killed by gang members in Honduras"); *Castillo*, 980 F.3d at 1282. The Board's opinion makes clear that the Board considered the evidence of country conditions; it was not required to mention Professor Barnes's report specifically.

The Board also adequately considered record evidence concerning the experience of mentally ill individuals in Mexico. Hernandez argues that the Board relied on "factual inaccuracies" in finding that he can obtain medication in Mexico, that he is unlikely to be institutionalized in Mexico, and that healthcare workers and the police will not intentionally subject him to torture. Here, too, Hernandez's argument is belied by the record.

Although Hernandez testified that his mother was unable to obtain medication for him in Mexico, he also testified that he was unaware of how she attempted to obtain it. There is no evidence that he sought to obtain medication or other treatment through the Mexican public health system, and substantial evidence supports the Board's finding that "the record contains evidence that [Hernandez] can obtain mental health treatment and medication through Mexico's public health insurance system." Similarly, the Board did not err in reasoning that Hernandez's family's previous support of him suggested they would support him in the future. Hernandez notes that his family sent only small amounts of money and visited him infrequently in Mexico. That his family's previous support was modest does not compel the conclusion that his family will not support him at all in the future.

21

Finally, the agency did not fail to consider evidence that Mexican healthcare workers and police specifically target mentally ill individuals for torture. The immigration judge acknowledged that the record shows that some institutionalized patients have suffered sexual abuse but determined that because Hernandez is unlikely to be institutionalized, the record did not establish that he would be more likely than not to be subject to such treatment. The immigration judge also considered the evidence of higher arrest and incarceration rates among mentally ill individuals but determined that there was insufficient evidence that this resulted in torture or was the result of a specific intent to torture mentally ill individuals. The Board stated that it agreed with those findings. The agency did not misstate or ignore Hernandez's evidence; it simply reached a different conclusion. And that conclusion was supported by substantial evidence.

## C

Finally, Hernandez contends that the Board erred because it did not aggregate the various risks of torture he faces. An applicant for CAT relief must show that it is more likely than not that he will be tortured if removed. 8 C.F.R. § 1208.16(c)(2). In assessing the probability of torture, the agency must consider all possible sources of torture. For example, if an alien claims that he may be tortured either by the police or by criminal gangs (with government acquiescence), it is not enough for the agency to say that torture by the police is not more likely

22

than not and that torture by gangs is not more likely than not, and to stop its analysis there. After all, even if neither event A nor event B is more likely than not to occur, the probability that *at least one* of event A *or* event B will occur could be sufficient to satisfy the more-likely-than-not standard. And under the CAT, "the relevant inquiry is . . . the *total* probability that the applicant will be tortured—considering all potential sources of and reasons for torture." *Velasquez-Samayoa v. Garland*, 38 F.4th 734, 738 (9th Cir. 2022); *accord Cole*, 659 F.3d at 775.

Hernandez says that the agency "separately evaluated each source of torture" and did not consider their combined probability, but that assertion is not supported by the record. The immigration judge specifically aggregated the risks of torture, describing Hernandez's various theories of potential torture and acknowledging "the possibility that *any or all* of the foregoing may occur" (emphasis added), but concluding that that possibility "falls well short of the standard of proof required for protection under CAT." The Board affirmed the immigration judge's decision, stating, "[w]e agree" with the immigration judge "that [Hernandez] has not demonstrated that he is more likely than not to be tortured, by or with the acquiescence (to include the concept of willful blindness) of a government official upon return to Mexico," and citing the immigration judge's opinion. *See Garcia-Martinez v. Sessions*, 886 F.3d 1291, 1293 (9th Cir. 2018) ("Where, as here, the BIA agrees with the IJ's reasoning, we review both decisions.").

Although the Board did not specifically address the combined probability of torture from different sources, its discussion of the CAT claim contained nothing to suggest that the Board had not adopted that aspect of the immigration judge's reasoning. *See Iraheta-Martinez v. Garland*, 12 F.4th 942, 960 (9th Cir. 2021) (holding that, even where "the BIA did not make it perfectly clear that it was performing an aggregate analysis," its opinion was "fairly read as approving the [immigration judge's] finding that the probability of torture is less than 50% in the aggregate"). In that respect, this case is different from *Velasquez-Samayoa*, in which we held that the Board erred because it expressly stated that in analyzing petitioner's "two alternative theories of torture," it had (erroneously) viewed them "as a [single] 'claimed chain of events that would lead to his torture.'" 38 F.4th at 739. In the absence of some contrary indication in the Board's opinion, we do not presume that the Board has disregarded the law—not to mention basic principles of logic and probability. The Board was not required to do more to adopt the immigration judge's reasoning. *Cf. Szonyi v. Barr*, 942 F.3d 874, 897 (9th Cir. 2019) (concluding that the Board "appeared to adopt the [immigration judge's] decision by giving examples from it").

**PETITION DENIED.**

24